Erik R. Puknys (SBN 190926)
erik.puknys@finnegan.com
M. Paul Barker (SBN 243986)
paul.barker@finnegan.com
Robert F. McCauley (SBN 162056)
robert.mccauley@finnegan.com
Eric K. Chiu (SBN 244144)
eric.chiu@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
3300 Hillview Avenue
Palo Alto, California  94304
Telephone:   (650) 849-6600
Facsimile:    (650) 849-6666

Attorneys for Plaintiff Cepheid

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CEPHEID,<br><br>                    Plaintiff,<br><br>          v.<br><br>ROCHE MOLECULAR SYSTEMS, INC. and F. HOFFMANN-LA ROCHE LTD.,<br><br>                    Defendants. | CASE NO. 12-cv-04411-EMC<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiff Cepheid, by and through its undersigned attorneys, hereby alleges as follows:

**NATURE OF THE ACTION**

1. Cepheid brings this action under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, for a declaratory judgment of (a) invalidity, expiration, and non-infringement of United States Patent No. 5,804,375 ("the '375 patent"); and (b) invalidity, unenforceability, expiration, and non-infringement of United States Patent No. 6,127,155 ("the '155 patent").

2. A copy of the '375 patent is attached as Exhibit A, and a copy of the '155 patent is attached as Exhibit B.

**THE PARTIES**

3. Cepheid is a corporation organized and existing under the laws of California with its principal place of business at 904 Caribbean Drive, Sunnyvale, California 94089.

4. On information and belief, Defendant Roche Molecular Systems, Inc. ("RMS") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 4300 Hacienda Drive, Pleasanton, California 94588. On information and belief, RMS owns the '375 and '155 patents.

5. On information and belief, Defendant F. Hoffmann-La Roche Ltd. ("Hoffmann") is a corporation organized and existing under the laws of Switzerland with its principal place of business at Grenzacherstrasse 124, CH-4070 Basel, Switzerland.

6. Collectively, RMS and Hoffmann will be referred to as "Roche."

**JURISDICTION AND VENUE**

7. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

8. RMS is engaged in the substantial, continuous, and systematic transaction of business in this judicial district. Hoffmann is an alien that has acted in this judicial district on behalf of itself and RMS with respect to the events that give rise to the claims against Roche. Accordingly, venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

**INTRA-DISTRICT ASSIGNMENT**

9. This action relates to an Intellectual Property matter and should be assigned on a district-wide basis under Civil L. R. 3-2(c).

**FACTUAL BACKGROUND**

10. In 2004, RMS, Hoffmann, and Cepheid executed an agreement entitled "IVD Products Patent License Agreement" by which RMS granted Cepheid a license to a number of United States patents, including the '375 patent, but not including the '155 patent. In 2005, RMS, Hoffmann, and Cepheid executed a revised license agreement (the "License Agreement"), which also conveyed a license to a number of United States patents, including the '375 patent, but not to the '155 patent. The License Agreement had an effective date of May 6, 2005.

11. In a letter dated May 19, 2010, RMS contended to its licensees, including Cepheid, that while some patents would expire on August 6, 2010, other patents—including the '375 patent and the '155 patent—were valid and would continue to be in force.

12. In a letter dated July 30, 2010, Cepheid informed RMS and Hoffmann that, pursuant to terms of the License Agreement, Cepheid was terminating its license to the '375 patent effective August 6, 2010, and that any royalty obligation under the '375 patent would end at midnight on August 5, 2010.

13. In a letter dated August 31, 2010, RMS and Hoffmann acknowledged receipt of Cepheid's letter, and contended that the '375 patent is valid under U.S. law and does not expire until the year 2015. Roche further contended that manufacture, use or sale of any product covered by the '375 patent would be infringement absent a license from Roche, and that "Cepheid has no rights anymore as per [sic] August 6, 2010" to manufacture, market or sell products covered by the '375 patent.

14. In a letter to Cepheid dated November 9, 2010, RMS wrote that "it has come to our attention that the above referenced License Agreement does not contain [the '155 patent] as a Licensed Patent, which we believe is necessary for certain of your products."

15. In a letter to Cepheid dated July 1, 2011, RMS contended that Cepheid's sale of unlicensed Xpert kits is covered by claim 21 of the '375 patent, that Cepheid was required by the

License Agreement to cease manufacture or sale of unlicensed Xpert kits, and that Cepheid should pay royalties based on the sale of unlicensed Xpert kits.

16. On April 24, 2012, RMS sent to Cepheid an RMS and Hoffmann "Term Sheet" for a license under the "Licensed Patents," including the '155 patent, with rights to "make, offer to sell and sell [licensee's] Complete Diagnostic Kits . . . ," only so long as the kit is "not covered by any ROCHE patents, [specifically including the '375 patent]."

## COUNT I
### (For a Declaratory Judgment that the '375 Patent is Expired and Invalid)

17. Cepheid re-alleges and incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1 through 16.

18. Because RMS has contended that the '375 patent is valid and necessary for Cepheid's products and because, as shown below, the '375 patent is expired and invalid, a conflict of asserted rights has arisen and a justiciable controversy exists between Cepheid and RMS with regard to whether the claims of the '375 patent are (a) expired and (b) invalid.

19. On May 6, 2011, a third-party (not affiliated with Cepheid and not supported or solicited to act by Cepheid) filed an *ex-parte* reexamination request relating to the '375 patent. On July 20, 2011, the United States Patent and Trademark Office ("PTO") granted that reexamination request, finding that a substantial new question of patentability had been raised as to every claim of the '375 patent.

20. On July 5, 2011, RMS submitted a request to the PTO to reissue the '375 patent. On July 6, 2011, RMS filed a Preliminary Amendment that added limitations to the independent claims of the '375 patent.

21. On January 19, 2012, the PTO issued an Office Action in the reexamination proceeding, rejecting several of the claims of the '375 patent as unpatentable in view of prior art, and rejecting all of the claims of the '375 patent as unpatentable due to non-statutory double patenting.

22. On May 3, 2012, in the reexamination proceeding, RMS filed an Amendment and Response Under 37 C.F.R. §1.530 that added limitations to the independent claims of the '375 patent. Also on May 3, 2012, RMS filed another Preliminary Amendment in the reissue application.

RMS stated that after entry of the two amendments of May 3, 2012, the claims in the reissue application were identical to the claims in the reexamination proceeding.

23. On May 17, 2012, RMS filed at the PTO a renewed petition to merge the reissue application and the reexamination proceeding, and on July 13, 2012, the PTO granted RMS's petition.

24. On August 27, 2012, the PTO issued an Office Action in the merged proceeding, rejecting all of the pending claims as unpatentable in view of prior art, and rejecting all of the pending claims as unpatentable due to non-statutory double patenting.

25. One or more claims of the '375 patent are invalid for at least the following reasons: (a) because the alleged invention is anticipated under 35 U.S.C. § 102; (b) because the alleged invention is obvious in view of the prior art under 35 U.S.C. § 103; and (c) because the specification fails to satisfy the requirements of 35 U.S.C. § 112. In addition, one or more claims of the '375 patent are invalid under non-statutory double patenting, and expired no later than August 6, 2010, in view of one or more patents commonly owned by RMS, including United States Patent Nos. 5,210,015 and 5,487,972, either alone or in combination with prior art. Accordingly, for at least these reasons, Cepheid is entitled to a declaratory judgment that the '375 patent is expired and invalid.

**COUNT II**
**(For a Declaratory Judgment that the '375 Patent is Not Infringed)**

26. Cepheid re-alleges and incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1 through 25.

27. Because RMS has contended that the '375 patent is valid and necessary for Cepheid's products, and because the '375 patent is not infringed, a conflict of asserted rights has arisen and a justiciable controversy exists between Cepheid and RMS with regard to whether the claims of the '375 patent are not infringed.

28. Cepheid has not infringed and will not infringe, either directly or indirectly, any valid or enforceable claim of the '375 patent by importing, making, having made, offering for sale, or

selling its Xpert kits, or on any other basis. Accordingly, for at least these reasons, Cepheid is entitled to a declaratory judgment that the '375 patent is not infringed.

**COUNT III**
**(For a Declaratory Judgment that the '155 Patent is Expired, Unenforceable, and Invalid)**

29. Cepheid re-alleges and incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1 through 28.

30. Because RMS has contended that the '155 patent is valid and necessary for Cepheid's products and because, as shown below, the '155 patent is expired, unenforceable, and invalid, a conflict of asserted rights has arisen and a justiciable controversy exists between Cepheid and RMS with regard to whether the claims of the '155 patent are (a) expired; (b) unenforceable; and (c) invalid.

31. One or more claims of the '155 patent are invalid for at least the following reasons: (a) because the alleged invention is obvious in view of the prior art under 35 U.S.C. § 103, and (b) because the specification fails to satisfy the requirements of 35 U.S.C. § 112. In addition, one or more claims of the '155 patent are invalid under non-statutory double patenting, and expired no later than December 26, 2006, in view of one or more patents commonly owned by RMS, including United States Patent No. 4,889,818 ("the '818 patent"), either alone or in combination with prior art. Accordingly, for at least these reasons, Cepheid is entitled to a declaratory judgment that the '155 patent is expired and invalid.

32. The '155 patent is not enforceable because, as shown below, it was procured through false declarations and egregious misrepresentations in its specification and prosecution history. Accordingly, for at least the reasons shown below, Cepheid is entitled to a declaratory judgment that the '155 patent is unenforceable.

**The '155 Patent is a Descendant of the Unenforceable '818 Patent**

33. The '155 patent is a descendant of the '818 patent, which was judicially found to have been procured through inequitable conduct.

34. Claim 1 of the original '155 patent is directed to:

> A stable enzyme composition comprising a purified thermostable nucleic acid polymerase enzyme in a buffer that comprises one or more non-ionic polymeric detergents.

35. In 1993, RMS and another Roche-related entity (Hoffmann-LaRoche, Inc.) brought suit against Promega Corp. in the United States District Court for the Northern District of California alleging infringement of the '818 patent. *Hoffmann-La Roche, Inc. v. Promega Corp.*, No. C-93-1748, 1999 U.S. Dist. LEXIS 19059 (N.D. Cal. Dec. 7, 1999) ("*Roche I*"). After a bench trial on inequitable conduct, the district court found that the applicants for the '818 patent, through their attorney Kevin Kaster, had made intentional material misrepresentations to the PTO with intent to mislead and to deceive the PTO, and held that the '818 patent was unenforceable.

36. RMS appealed the *Roche I* judgment to the United States Court of Appeals for the Federal Circuit. In 2003, the Federal Circuit affirmed multiple grounds of inequitable conduct and remanded for a determination of whether those grounds were sufficient to hold the '818 patent unenforceable. *Hoffmann-La Roche, Inc. v. Promega Corp.*, 323 F.3d 1354 (Fed. Cir. 2003) ("*Roche II*").

37. On remand, the district court held the '818 patent unenforceable based on its findings that the applicants committed inequitable conduct by:

> "making misleading statements regarding the relative fidelity of Taq as compared to the prior art enzymes;"
>
> "claiming that Taq purified by the method taught in Example VI had a specific activity of 250,000 units/mg;"
>
> "presenting Example VI as though it had been performed when, in fact, it had not been performed;"
>
> "making deceptive, scientifically unwarranted comparisons between the specific activity of the claimed enzyme and the specific activity reported by Chien et al. and Kaledin et al.;"
>
> "claiming that Taq purified according to the method taught in Example VI yielded a single 88 kd band on an SDS PAGE mini-gel and"
>
> "claiming that the Taq produced was free from nuclease contamination."

*Hoffmann-La Roche, Inc. v. Promega Corp.*, 319 F. Supp. 2d 1011, 1016 (N.D. Cal. 2004) ("*Roche III*"). The parties subsequently settled, and the case was dismissed with prejudice against RMS and its co-plaintiff.

38. After the '818 patent was held unenforceable because of inequitable conduct, RMS and a number of other Roche-related entities faced an antitrust class action lawsuit based on RMS's enforcement of the '818 patent. *Molecular Diagnostics Labs. v. Hoffmann-La Roche, Inc. et al.*, 1:04-cv-01649-HHK (D.D.C.). According to public documents, RMS and its co-plaintiffs reportedly settled that lawsuit in 2008 for $33,000,000.

39. As explained below, the inequitable conduct that occurred in the '818 patent tainted the enforceability of the '155 patent, and the same type of inequitable conduct was committed in the preparation and prosecution of the '155 patent application.

**The '155 Patent's Named Inventors**

40. The initial named co-inventors on the '818 patent are David Gelfand, Susanne Stoffel, Frances Lawyer, and Randall Saiki. The '818 patent issued in 1989.

41. The application that became the '155 patent was filed in 1992 as a continuation of a 1989 application that was subsequently abandoned (collectively, "the '155 patent application"). On information and belief, in 1991, Roche acquired all right, title, and interest in the '155 patent application and controlled its prosecution thereafter.

42. The co-inventors originally named in the '155 patent application were the same as the four initially named co-inventors on the '818 patent, but the inventor list was subsequently changed to remove Frances Lawyer. Thus, the three named inventors for the '155 patent are David Gelfand, Susanne Stoffel, and Randall Saiki.

**False Example XIII in the '155 Patent Application**

43. The applicants, including named inventors David Gelfand, Susanne Stoffel, and Randall Saiki, included a false and deceitful example of a purification protocol in the specification of the '155 patent application. Specifically, the applicants presented the purification protocol described in Example XIII of the '155 patent application in the past tense and, on information and belief, did

so with intent to mislead and to deceive the PTO into believing that the protocol had been performed when it had not been performed.

44. RMS has admitted that Example XIII of the '155 patent application corresponds to Example VI of the '818 patent. Reexam of the '155 patent, Application Serial No. 90/007,416 (the "'155 Reexam"), Fourth IDS, December 6, 2005, at 3-4. In fact, the text of Example XIII of the '155 patent application is substantially the same as the text of Example VI of the '818 patent.

45. In *Roche I*, the district court found that inventors David Gelfand and Susanne Stoffel were aware that representations and information regarding purity were material, but never actually performed the purification protocol described in Example VI of the '818 patent. *Roche I*, 1999 U.S. Dist. LEXIS 19059, at *21, 23, 37, and 45-46. The Federal Circuit affirmed this finding. *Roche II*, 323 F.3d at 1364, 1367-68.

46. In *Roche I*, the district court found that Example VI of the '818 patent had been written in the past tense in order to deceive the PTO into believing that the protocol had been performed. *Roche I*, 1999 U.S. Dist. LEXIS 19059, at *25-26. The Federal Circuit affirmed this finding. *Roche II*, 323 F.3d at 1365-66.

47. In *Roche I*, the district court found that the use of the past tense itself evidenced an intent to deceive the PTO. *Roche I*, 1999 U.S. Dist. LEXIS 19059, at *25-26:

> Gelfand understood that when experiments are described using the past tense, the author represents that the procedures described have actually been performed as written and the results reported have actually been achieved using those procedures. Stoffel also understood that a scientist using the past tense represents that the experiment described has actually been performed. The inventors were aware of the materiality of reporting Example VI in the past tense, without indicating that it was prophetic.
>
> . . . the court finds that Example VI was written in the past tense in order to deceive the PTO into believing that it had actually been performed. The fact that Example VI may have been a superior method of purification is irrelevant; it had not been performed as written, the inventors knew that it had not been performed as written and they understood the significance of using the past tense to describe experiments. Under these circumstances, the court finds that the inventors' misrepresentation was intentional.

48. Representations and information regarding purity were also material in the prosecution of the '155 patent application. The applicants' agent, Stacey Sias, argued: "The [Examiner's] rejection is not supported by the references where none provides or suggests an

1  essential element of the pending claims. None of the references provide or suggest a *purified*
2  thermostable polymerase enzyme." PTO Paper # 24, January 19, 1993, at 10 (emphasis added).

3  49. RMS has admitted that the purification protocol described in Example XIII of the
4  '155 patent application was not practiced by the named inventors. '155 Reexam, Fourth IDS,
5  December 6, 2005, at 4. By presenting the purification protocol of Example XIII in past tense to
6  suggest that the protocol had been performed, while failing to disclose during prosecution of the
7  original '155 patent application that the protocol of Example XIII had not actually been performed,
8  the applicants affirmatively engaged in egregious misconduct.

9  50. Just as the same applicants had previously presented Example VI of the '818 patent in
10 the past tense, the applicants presented Example XIII of the '155 patent application in the past tense.
11 The single most reasonable inference is that the applicants did so with intent to deceive the PTO into
12 believing that the purification protocol had been performed when it had not been performed.

13 51. On information and belief, Example XIII was material, was presented with the intent
14 to deceive the PTO, and renders the '155 patent unenforceable due to inequitable conduct.

15 **False Declarations Submitted to the PTO**

16 52. During prosecution of the '155 application, the PTO rejected numerous pending
17 claims on the basis of a product information sheet of Molecular Biology Resources ("MBR product
18 information"), which pre-dated the earliest applicable filing date. PTO Paper # 7, September 4,
19 1990, at 4-6. In response to the PTO's rejection based on the MBR product information, the named
20 inventors submitted two declarations.

21 53. The first declaration was submitted by named inventor David Gelfand. PTO Paper #
22 10, February 11, 1991. In that declaration, Gelfand declared that he and his co-inventors had
23 reduced their claimed invention to practice well before the date of the MBR product information,
24 and that evidence of their reduction to practice was shown by a *Taq* polymerase purification protocol
25 that was attached to the declaration. *Id*. RMS later asserted that *Taq* polymerase purification
26 protocol was a scaled-up version of the purification protocol set forth in Example XIII of the '155
27 patent, which is substantially the same as Example VI of the '818 patent. '155 Reexam, Fourth IDS,
28 December 6, 2005, at 3-4. The applicants' attorney, Kevin Kaster, requested that the PTO withdraw

1  its rejection in view of the declaration. PTO Paper # 9, February 11, 1991, at 6. The PTO found this
2  first declaration inadequate on the grounds that, among other things, it was not signed by all the
3  named inventors. PTO Paper # 11, May 3, 1991, at 2.

4       54. The second declaration was, as a result, submitted by all of the named inventors, i.e.,
5  David Gelfand, Susanne Stoffel, and Randall Saiki. Declaration accompanying PTO Paper # 20,
6  April 24, 1992. In that declaration, all of the named inventors declared that they had reduced their
7  claimed invention to practice well before the date of the MBR product information, and that
8  evidence of their reduction to practice was shown by the *Taq* polymerase purification protocol that
9  David Gelfand had previously submitted, and the inventors attached another copy to their
10 declaration. *Id*. The applicants' attorney, now David Highet, again requested that the PTO
11 withdraw its rejection in view of the declaration, contending that the product of the attached protocol
12 was "exactly" what was claimed in application Claim 1 and arguing that the declaration "should be
13 accorded more evidentiary significance than the posturing of a party involved in a dispute" because
14 the declaration was made "with the knowledge that willful false statements could result in . . .
15 invalidation of any patent issuing from the present application." PTO Paper # 20, April 24, 1992, at
16 2-10. The PTO Examiner found the second declaration inadequate on substantive grounds. PTO
17 Paper # 21, July 15, 1992, at 3-5.

18       55. As RMS has since admitted, the *Taq* polymerase purification protocol attached to the
19 declarations had never been performed by the inventors. '155 Reexam, Fourth IDS, December 6,
20 2005, at 3-4. By relying on the *Taq* polymerase purification protocol as evidence of earlier reduction
21 to practice in order to overcome the Examiner's rejection, while failing to disclose during
22 prosecution of the original '155 patent application that the protocol had not actually been performed,
23 RMS, including at least named inventors David Gelfand, Susanne Stoffel, and Randall Saiki,
24 affirmatively engaged in egregious misconduct.

25       56. In addition, the PTO Board of Patent Appeals and Interferences ("PTO Board") relied
26 in part on the inventors' second declaration in reversing the rejections that had been based on the
27 MBR product information. PTO Paper # 38, July 30, 1999, at 2-4, 8. The PTO Board stated, "In our
28 view, the declarations establish that applicants reduced the claimed invention to practice prior to [the

10    FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT
CASE NO. 12-cv-04411-EMC

publication date of the MBR production information]." *Id.* at 8. The PTO issued a Notice of Allowability (PTO Paper # 40, October 6, 1999) and the '155 patent subsequently issued.

57. Just as the district court found in *Roche I* and *Roche III* with respect to Example VI of the '818 patent, the inventors made material misrepresentations regarding the *Taq* polymerase purification protocol, and the single most reasonable inference is that the applicants did so with intent to mislead and to deceive the PTO into believing the protocol had been performed when it had not been performed. The inventors made those misrepresentations to show an earlier reduction to practice in order to remove a prior art reference over which claims had been rejected.

58. On information and belief, the declaration was material to examination by the PTO, was made with the intent to deceive the PTO, and renders the '155 patent unenforceable due to inequitable conduct.

**RMS Expressly Tied its Prosecution of the '155 Patent to its Inequitable Conduct in the Prosecution of the '818 Patent**

59. During the prosecution of the '155 application, the PTO rejected numerous claims on the basis of publications by Kaledin. PTO Paper # 7, September 4, 1990, at 6-7.

60. As had been done previously in the '818 patent prosecution, the applicants, including named inventors David Gelfand, Susanne Stoffel, and Randall Saiki, distinguished Kaledin on the grounds that their claims required a "purified" enzyme whereas Kaledin's enzyme was "crude." *See* PTO Paper # 21, July 15, 1992, at 6. *See also*, PTO Paper # 32, July 11, 1994, at 12, stating that the Kaledin enzyme "is a crude preparation, comparable in activity to 1.5% of the purity of [Applicants'] teaching."

61. Representations and information regarding purity were also material in the prosecution of the '155 patent application. During the prosecution of the '155 patent, the applicants, through their agent Stacey Sias, relied on the prosecution history of the '818 patent to support their purported distinction, stating:

> The pending claims, however, are directed to a <u>purified</u> enzyme composition. The Patent Office has previously determined that the purified enzyme compositions provided by the present application are novel and non-obvious in view of the crude partially degraded preparations of Kaledin <u>et al</u>. (see U.S. Patent No. 4,889,818, which issued from the grandparent to the present application).

PTO Paper # 24, January 19, 1993, at 10. Ms. Sias made similar arguments on appeal to the PTO Board. Reply Brief, July 6, 1994, at 12 ("The Kaledin enzyme is a crude preparation, comparable in activity to 1.5% of the purity of Appellants' teaching. . . . The issuance in 1989 of the great grandparent application as U.S. Patent No. 4,889,818 . . . over Kaledin (1980 and 1981) evidence the facts for the record."). The applicants and Ms. Sias thus directly tied the prosecution of the '155 patent application to the prosecution of the '818 patent with regard to the alleged purity of the claimed invention.

62. In *Roche I*, the district court found that the representations made in the '818 patent prosecution and in the '818 specification about the alleged purity of the claimed invention were intentional misrepresentations. *Roche I*, 1999 U.S. Dist. LEXIS 19059, at *24-26. The district court also found that the comparison made in the '818 patent prosecution about the specific activity of the claimed invention and the prior art was deceptive and improper. *Id.* at *26-28. The Federal Circuit affirmed those findings. *Roche II*, 323 F.3d at 1363-69.

63. The applicants expressly connected the prosecution of the '155 patent application to the prosecution of the '818 patent, and the '155 patent has an immediate and necessary relation to the inequitable conduct committed during prosecution of the '818 patent. The '155 patent is tainted and infected by the applicants' inequitable conduct and therefore unenforceable.

**Had RMS's Deceit Been Timely Disclosed to the PTO, the '155 Patent Would Have Expired Prior to 2008**

64. Subsequent to the October 6, 1999 Notice of Allowability of the '155 patent, RMS, including at least named inventors David Gelfand, Susanne Stoffel, and Randall Saiki, through its attorney Douglas Petry, made an untimely attempt to submit briefs from *Roche I* that detailed the inequitable conduct committed during prosecution of the '818 patent. In particular, Mr. Petry sought to disclose to the PTO the pre-trial and post-trial briefs from *Roche I*, while at the same time contending that the misrepresentations and omissions alleged with respect to the '818 patent were "not believed to be relevant to the patentability of the subject matter claimed" in the '155 patent application. PTO Paper # 41, October 7, 1999, at 3, 7-8 Mr. Petry advanced that representation despite the fact that the applicants had asserted the same purity arguments in the '155 patent

prosecution that were at issue in the *Roche I* briefs regarding the '818 patent. In fact, by making those purity arguments, the applicants had directly tied the prosecution of the '155 patent application to the prosecution of the '818 patent with regard to the alleged purity of the claimed invention in order to overcome a rejection. *See* PTO Paper # 24, January 19, 1993, at 10. Mr. Petry failed to call attention to the substance of the alleged untrue or misleading assertions, failed to specifically state where the alleged misrepresentations and omissions had previously occurred during prosecution, and failed to make clear that further examination may be required. The PTO refused to consider the information presented because RMS had failed to comply with the requirements for a disclosure made after a Notice of Allowability. PTO Paper # 42, January 14, 2000. Those requirements included a certification that the material being submitted was not known to RMS more than three months before the submission. 37 C.F.R. § 1.97(e). On information and belief, RMS had the pre-trial briefs in its possession for more than nine months before it sought to disclose them to the PTO and had the post-trial briefs in its possession for at least five months before seeking to disclose them to the PTO.

65. RMS, through its attorneys Jennifer Gordon and Margaret Brivanlou, petitioned the PTO to waive the requirements for a disclosure made after a Notice of Allowability, arguing that to make the disclosure without a waiver would require RMS to file a continuation application, which would cause the resulting '155 patent to terminate in 2007. Petition, December 7, 1999, at 4. The PTO dismissed the petition for a waiver, noting that RMS had not offered any explanation for its "protracted delay" in bringing the items to the attention of the PTO. PTO Paper # 44, April 14, 2000, at 2. Following the PTO's dismissal, according to the assertions of Ms. Gordon and Ms. Brivanlou, if RMS had proceeded with submitting the details of the '818 patent applicants' inequitable conduct in a continuation application, the '155 patent would have expired prior to 2008, as opposed to its current alleged expiration in 2017. However, RMS did not to do so, and thus the pre-trial and post-trial briefs from *Roche I* were never entered into the prosecution record of the '155 patent application.

66. Also subsequent to the Notice of Allowability, RMS submitted to the PTO the opinion of the district court in *Roche I* holding that the '818 patent was unenforceable for inequitable

conduct. PTO Paper No. 46, December 27, 1999. The PTO allowed RMS to make this submission, which was presented to the PTO within three weeks of the *Roche I* decision. *Id*; PTO Paper No. 49, July 17, 2000. RMS did not supply any of the factual material underlying the opinion, even though that material had been in RMS's possession prior to submitting the opinion. Third Supplemental IDS, December 27, 1999, at 2. Again, while submitting only the district court's decision rendering the '818 patent unenforceable for inequitable conduct, RMS and its attorney failed to call attention to the fact that the applicants had directly tied the prosecution of the '155 patent application to the prosecution of the '818 patent, failed to specifically state where the misrepresentations had been repeated during prosecution of the '155 patent, and failed to make clear that further examination may be required.

67. Inequitable conduct is not a criterion for patentability that is considered by the PTO and the PTO "does not investigate and reject original or reissue applications [for inequitable conduct] under 37 CFR 1.56." Manual of Patent Examining Procedure § 2010 (7th ed. 1998) (explaining that a "court, with subpoena power, is presently the best forum to consider duty of disclosure issues under the present evidentiary standard for finding an 'intent to mislead'"). Accordingly, the PTO could not take inequitable conduct under consideration in deciding whether to allow the '155 patent.

68. RMS was aware of the findings of inequitable conduct rendering the '818 patent unenforceable and acknowledged during reexamination of the '155 patent, through its attorney Jennifer Gordon, that the statements that had led to unenforceability of the '818 patent were "similar to" statements made in the '155 patent prosecution. '155 Reexam, Fourth IDS, December 6, 2005, at 2-5.

69. On information and belief, but for the failure to submit the details of the '818 patent applicants' inequitable conduct in a continuation application, the '155 patent, if allowed, would have had an expiration date prior to 2008.

**By Withholding the Kemp Declaration, RMS Avoided Losing Approximately Ten Years of Patent Term**

70. To avoid losing approximately ten years of patent term, on information and belief, RMS's attorneys, Douglas Petry and Jennifer Gordon, deliberately, and with deceptive intent, chose not to enter material references from counterpart opposition proceedings into the prosecution record of the '155 patent application. In particular, Mr. Petry and Ms. Gordon withheld the "Affidavit of Bruce Ernest Kemp from Australian Proceedings (see particularly § 4)" ("Kemp Declaration"), which later served as a basis for a reexamination rejection of claims 1-2, 4-7, 9-12, and 17 of the '155 patent as anticipated by Ruttiman et al. (1985) *Eur. J. Biochem.* 149:41-46 ("Ruttiman"). '155 Reexam, Office Action, September 1, 2006, at 6-10.

71. Although Ruttiman was in the record of the original '155 patent application, the Kemp Declaration was not. Subsequent events show that the omission of the Kemp Declaration from the original '155 patent application materially affected the outcome of prosecution. Specifically, during reexamination proceedings for the '155 patent, Ms. Gordon submitted "Kemp 7/99 Aff. (Ref. 116), paras. 4.19-.21" which, on information and belief, is the Kemp Declaration. '155 Reexam, Request for *Ex Parte* Reexamination, February 9, 2005, at 6; *see also* '155 Reexam, IDS, Form PTO-1449, February 9, 2005, at 8 (Document Number 116; "July 1, 1999 Kemp Affidavit Filed In The Appeal From The Delegate's Decision In The Australian Opposition"). Ms. Gordon and Christopher Sappenfield, another one of RMS's attorneys, then conducted an interview with the Examiner, asking him to consider the teaching of Brij-58, a non-ionic detergent, on page 42 of Ruttiman, together with the Kemp Declaration. '155 Reexam, Response to Office Action in *Ex Parte* Reexamination, February 16, 2006, at 13-14.

72. Following the interview with Ms. Gordon and Mr. Sappenfield, the Examiner rejected claims 1-2, 4-7, 9-12 and 17 of the '155 patent under 35 U.S.C. § 102(b) as being anticipated by Ruttiman. '155 Reexam, Office Action, September 1, 2006, at 6-10. The Examiner asserted that Ruttiman showed a buffered, purified DNA polymerase enzyme and a non-ionic detergent (Brij-58), which anticipated claim 1 of the '155 patent. *Id*. at 7-8. In response to an argument that, in Ruttiman, Brij-58 would have been removed from the polymerase by purification steps, the Examiner relied on the Kemp Declaration to show that "[m]ere centrifugation to remove the

1 detergent-insoluble protein fraction would not be expected to remove the Brij-58 from the resulting
2 enzyme containing supernatant. See Kemp Declaration page 18 Paragraph 4.20 dated July 1, 1999."
3 *Id.* at 9-10.

4     73. Following that rejection, Mr. Sappenfield amended claim 1 of the '155 patent to
5 exclude the species of detergent disclosed in Ruttiman. Response to Office Action in *Ex Parte*
6 Reexamination, September 28, 2006, at 2, 12-14; *Ex Parte* Reexamination Interview Summary, June
7 27, 2006; Response to Office Action in *Ex Parte* Reexamination, July 5, 2006, at 2, 14-16. The
8 Examiner then allowed claim 1 as amended and provided the following reasons for patentability:
9 "[a]mended claim 1 (and claims dependent thereon) exclude the genus of polyoxyethylene cetyl
10 ether non-ionic polymeric detergents (or surfactants) which includes the Brij-58 species disclosed in
11 Ruttiman reference thereby overcoming the anticipation rejection over this reference." Notice of
12 Intent to Issue *Ex Parte* Reexamination Certificate, December 7, 2006, at 1, 3.

13     74. In the prosecution of the original '155 patent application, Mr. Petry and Ms. Gordon
14 had an earlier opportunity to submit the Kemp Declaration and other documents into the record, but,
15 on information and belief, deliberately, and with deceptive intent, chose not to do so. In fact, Mr.
16 Petry and Ms. Gordon tried to make an untimely submission of documents from counterpart
17 proceedings to the '155 patent application, including the Kemp Declaration, and the briefs from
18 *Roche I*. *See* PTO Paper #41, October 7, 1999, at 2, 6; Petition, December 7, 1999, at 2-3. In doing
19 so, Mr. Petry and Ms. Gordon represented that the "[t]he cited references have been reviewed in
20 connection with the captioned application, and, for the reasons discussed in detail in the October
21 1999 IDS, it is believed that these references . . . are either cumulative to, or are less relevant than,
22 the references already of record in the captioned application." Petition, December 7, 1999, at 2-3,
23 citing PTO Paper #41, October 7, 1999. Based on this assertion, the single most reasonable
24 inference is that Mr. Petry and Ms. Gordon studied the Kemp Declaration as it related to the
25 prosecution of the '155 patent. Moreover, the statement that the Kemp Declaration was cumulative
26 or less relevant than references already of record is totally at odds with Ms. Gordon's actions in the
27 subsequent reexamination proceeding.

28

75. As discussed above, because Mr. Petry and Ms. Gordon had failed to comply with the requirements for disclosures made after a Notice of Allowability, the PTO would not accept their untimely submission. PTO Paper # 42, January 14, 2000; PTO Paper # 44, April 14, 2000, at 2. But, as Ms. Gordon acknowledged, the documents from the counterpart proceedings, including the Kemp Declaration, could have been entered into the prosecution record as part of a continuation application, which would have caused the '155 patent to expire prior to 2008, many years earlier than the current alleged expiration date of 2017. *See* Petition, December 7, 1999, at 4. No such continuation application was filed, and the Kemp Declaration and other documents were not entered into the prosecution record of the original '155 patent application.

76. On information and belief, RMS, through its attorneys Mr. Petry and Ms. Gordon, deliberately and deceptively chose not to submit the Kemp Declaration and other documents to avoid a shortened term for the '155 patent. The single most reasonable inference is that Mr. Petry and Ms. Gordon knew of the heightened materiality of the Kemp Declaration and withheld it with the intent to deceive the PTO of its relevance and to avoid filing a continuation application, which would have resulted in a significantly shortened term of the '155 patent.

77. On information and belief, but for the failure to submit the Kemp Declaration, several claims of the original '155 patent never would have issued. Moreover, had the Kemp Declaration been submitted in a continuation application, the '155 patent would have had an expiration date prior to 2008.

**COUNT IV**
**(For a Declaratory Judgment that the '155 Patent is Not Infringed)**

78. Cepheid re-alleges and incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1 through 77.

79. Because RMS has contended that the '155 patent is valid and necessary for Cepheid's products, and because the '155 patent is not infringed, a conflict of asserted rights has arisen and a justiciable controversy exists between Cepheid and RMS with regard to whether the claims of the '155 patent are not infringed.

80. Cepheid has not infringed and will not infringe, either directly or indirectly, any valid or enforceable claim of the '155 patent by importing, making, having made, offering for sale, or selling its Xpert kits, or on any other basis. Accordingly, for at least these reasons, Cepheid is entitled to a declaratory judgment that the '155 patent is not infringed.

### PRAYER FOR RELIEF

Wherefore, Plaintiff Cepheid prays for judgment against Defendants, and respectfully requests that this Court:

A. Declare that United States Patent Nos. 5,804,375 and 6,127,155 are invalid, and in any event, under non-statutory double patenting cannot be enforced after their expiration on August 6, 2010, and December 26, 2006, respectively;

B. Declare that Cepheid has not infringed, and is not infringing, United States Patent Nos. 5,804,375 or 6,127,155;

C. Declare that United States Patent No. 6,127,155 is unenforceable due to inequitable conduct;

D. Declare this case exceptional under 35 U.S.C. § 285 and award Cepheid its costs, disbursements, and attorneys' fees in connection with this action;

E. Award Cepheid any other relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Cepheid demands a trial by jury on all matters so triable.

Dated: September 14, 2012

Respectfully submitted,

By: */s/Erik R. Puknys*

Erik R. Puknys (SBN 190926)
erik.puknys@finnegan.com
M. Paul Barker (SBN 243986)
paul.barker@finnegan.com
Robert F. McCauley (SBN 162056)
robert.mccauley@finnegan.com
Eric K. Chiu (SBN 244144)
eric.chiu@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
3300 Hillview Avenue
Palo Alto, California  94304
Telephone:     (650) 849-6600
Facsimile:      (650) 849-6666

Attorneys for Plaintiff Cepheid