**[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]**

COOLEY LLP
Mark F. Lambert (197410)
mlambert@cooley.com
Lam K. Nguyen (265285)
lnguyen@cooley.com
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
Stephen S. Rabinowitz
srabinowitz@friedfrank.com
Randy C. Eisensmith (*Pro Hac Vice*)
randy.eisensmith@friedfrank.com
Michael A. Kleinman (*Pro Hac Vice*)
Michael.kleinman@friedfrank.com
One New York Plaza
New York, New York 10004-1980
(212) 859-8000
Fax: (212) 859-4000

Attorneys for Defendant
ROCHE MOLECULAR SYSTEMS, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CEPHEID,<br><br>    Plaintiff,<br><br>- against -<br><br>ROCHE MOLECULAR SYSTEMS, INC. and F. HOFFMANN-LA ROCHE LTD.,<br><br>    Defendants. | 3:12-CV-04411-EMC<br><br>**REPLY BY DEFENDANT ROCHE MOLECULAR SYSTEMS, INC. IN SUPPORT OF MOTION TO STAY COUNTS I & II UNDER THE FEDERAL ARBITRATION ACT AND DISMISS COUNTS III & IV UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(B)(1)**<br><br>Date: December 21, 2012<br>Time: 1:30 p.m.<br>Ctrm: 5, 17th Floor<br>Judge: Honorable Edward M. Chen |

**[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]**

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................... I

I.   INTRODUCTION ........................................................................................................ 1

II.  ARGUMENT ................................................................................................................ 1

    A.   Counts I and II of the First Amended Complaint Should Be Stayed Until Completion of the Pending Arbitration in Switzerland .................. 1

    B.   Counts III and IV of the First Amended Complaint Should Be Dismissed Under Rule 12(b)(1) for Lack of Subject Matter Jurisdiction ........................................................................................... 3

        1.   Cepheid Mischaracterizes the Parties' Communications Regarding the '155 Patent ........................................................... 3

        2.   Cepheid Misreads the "All-the-Circumstances" Test of *MedImmune* ............................................................................... 10

        3.   Even if Article III Jurisdiction Exists, the Court Should Dismiss Counts III and IV of the First Amended Complaint in Its Discretion .................................................................... 13

III. CONCLUSION .......................................................................................................... 14

**[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]**

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*3M Co. v. Avery Dennison Corp.*,
  673 F.3d 1372 (Fed. Cir. 2012)......................................................................................11, 12

*A'ssn for Molecular Pathology v. United States Patent & Trademark Office*,
  689 F.3d 1303 (Fed. Cir. 2012)......................................................................................8, 9, 11

*ABB Inc. v. Cooper Industries, LLC*,
  635 F.3d 1345 (Fed. Cir. 2011)......................................................................................6, 8, 11

*Applera Corp. v. Michigan Diagnostics*,
  594 F. Supp. 2d 150 (D. Mass. 2009) ............................................................................5, 7

*City of L.A. v. Lyons*,
  461 U.S. 95 (1983)..........................................................................................................12

*Edmunds Holding Co. v. Autobytel Inc.*,
  598 F. Supp. 2d 606 (D. Del. 2009) ...............................................................................8

*EMC Corp. v. Norand Corp.*,
  89 F.3d 807 (Fed Cir. 1996)...........................................................................................13, 14

*Harrison v. Nissan Motor Corp.*,
  111 F.3d 343 (3d Cir. 1997)...........................................................................................2

*Healy v. RBC Dain Rauscher*,
  No. C. 04-4873MMC, 2005 WL 387140 (N.D. Cal. Feb. 17, 2005).............................2

*Hewlett-Packard v. Acceleron LLC*,
  587 F.3d 1358 (Fed. Cir. 2009)......................................................................................12

*Innovative Therapies, Inc. v. Kinetic Concepts*,
  599 F.3d (Fed. Cir. 2010)...............................................................................................13

*Kingman Reef Atoll Invests., L.L.C. v. United States*,
  541 F.3d 1189 (9th Cir. 2008) .......................................................................................10

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)........................................................................................................9

*Md. Cas. Co. v. Pac. Coal & Oil Co.*,
  312 U.S. 270 (1941)........................................................................................................10

*MedImmune v. Genentech, Inc.*,
  549 U.S. 118 (2007)........................................................................................................3, 4, 13

*Monsanto Co. v. Syngenta Crop Protection, Inc.*,
  2008 WL 294291 (E.D. Mo. Jan. 31, 2008) ..................................................................5, 6, 11

**[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]**

*Prasco, LLC v. Medicis Pharm. Corp.*,
  537 F.3d 1329 (Fed. Cir. 2008) ..........................................................................................10

*SanDisk Corp. v. STMicroelectronics, Inc.*,
  480 F.3d 1372 (Fed. Cir. 2007) ................................................................................6, 7, 11

*Wolsey, Ltd. v. Foodmaker, Inc.*,
  144 F.3d 1205 (9th Cir. 1998) ..............................................................................................2

*Wooster Brush Co. v. Bercom Int'l, LLC*,
  No. 5:06CV474, 2008 WL 1744782 (N.D. Ohio Apr. 11, 2008) ...........................................7

*Zoove Corp. v. StarPound Corp.*,
  20012 WL 3580526, at *2 (N.D. Cal. Aug. 17, 2012) .................................................11, 12, 13

**STATUTES**

9 U.S.C. § 3 (2006) ..........................................................................................................1, 2

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12(b)(1) (2012) ................................................................1, 10, 14

**[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]**

I. **INTRODUCTION**

Defendant Roche Molecular Systems, Inc. ("RMS") respectfully submits this reply brief in support of its Motion to Stay Counts I & II Under the Federal Arbitration Act and Dismiss Counts III & IV Under Federal Rule of Civil Procedure 12(b)(1) (2012) ("Motion").

With respect to Counts I and II of the First Amended Complaint, which concern the '375 patent, Cepheid does not dispute that this litigation should be stayed in view of the parallel arbitration in Switzerland, but takes issue with the *duration* of the stay proposed by RMS.  *See* Plaintiff's Opposition to Defendant Roche Molecular Systems, Inc.'s Motion to Stay Counts I and II Under the Federal Arbitration Act and Dismiss Counts III and IV Under Federal Rule of Civil Procedure 12(b)(1) ("Opp.") at 2, lines 7-11.  As shown below, Cepheid's proposed stay does not comply with the Federal Arbitration Act, which requires the parallel litigation to be stayed "until [the] arbitration *has been had* . . . ." 9 U.S.C. § 3 (2006) (emphasis added).

With respect to Counts III and IV of the First Amended Complaint, which concern the '155 patent, Cepheid has failed to demonstrate the existence of subject matter jurisdiction, but instead mischaracterizes the communications between the parties concerning the '155 patent and misinterprets the applicable legal standard.  When the parties' communications are considered in the context of the totality of the circumstances, it is clear that there is no justiciable dispute regarding the '155 patent, and that Counts II and IV must be dismissed.

II. **ARGUMENT**

    A. **Counts I and II of the First Amended Complaint Should Be Stayed Until Completion of the Pending Arbitration in Switzerland**

In its opposition, Cepheid does not dispute that the Court should stay proceedings on Counts I and II in view of the parallel arbitration between the parties in Switzerland.  Cepheid only takes issue with the *duration* of the stay proposed by RMS.  Cepheid asks the Court to impose a stay that, by its own terms, would expire automatically when ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]

1 █████████████████████████ ███████████
2 █████████████████████████

Cepheid cites no case in which any court has imposed a stay under the Federal Arbitration Act that automatically terminates midway through the arbitration. In fact, the Ninth Circuit has explained that the term "arbitration" under the Federal Arbitration Act contemplates an agreement to "arbitrate these disputes through to completion." *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1208 (9th Cir. 1998) (quoting *Harrison v. Nissan Motor Corp.*, 111 F.3d 343, 350 (3d Cir. 1997)). In other words, "[a]rbitration does not occur *until the process is completed and the arbitrator makes a decision*" and the parties "*cannot seek recourse to the courts before that time.*" *Id.*

The Federal Arbitration Act requires that the parallel litigation be stayed "until such arbitration *has been had* in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3 (emphasis added). The stay proposed by Cepheid would terminate while the arbitration *is being had*, and would not comply with the Act. The proper course is for the Court to stay Counts I and II until the conclusion of the arbitration. *See, e.g., Healy v. RBC Dain Rauscher*, No. C. 04-4873MMC, 2005 WL 387140, at *2 (N.D. Cal. Feb. 17, 2005) (granting motion to compel arbitration and staying proceedings under Section 3 of the Federal Arbitration Act "pending *completion* of the arbitration") (emphasis added). The Court can and should order the parties to submit a joint status report within 30 days of ████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████

███████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████

2

**[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]**

### B. Counts III and IV of the First Amended Complaint Should Be Dismissed Under Rule 12(b)(1) for Lack of Subject Matter Jurisdiction

Cepheid has failed to satisfy its burden of demonstrating the existence of a "substantial controversy" between the parties regarding the '155 patent that is "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment," *MedImmune v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Accordingly, Counts III and IV of the First Amended Complaint should be dismissed for lack of subject matter jurisdiction.

#### 1. Cepheid Mischaracterizes the Parties' Communications Regarding the '155 Patent

In its opposition, Cepheid relies on four communications between the parties concerning the '155 patent.[2] Opp. at 6-7. As shown below, Cepheid misconstrues the content and effect of those communications.

##### a. The September 12, 2007 Email

In its opposition, Cepheid relies, for the first time, on an email from RMS to Cepheid, dated September 12, 2007, providing a laundry list of patents that were available for licensing. *See* Opp. at 6, lines 11-14 (citing Hulse Decl., Exh. 2). Cepheid misleadingly describes this email as "seeking to license the '155 patent." Opp. at 10, lines 2-3. In fact, this email provided a list of *112* patents in Roche's portfolio that were available for licensing, including the '155 patent, and stated: "You can either add individual patents – each has its own price (*indicate the ones you want* and I'll respond with how much would cover them – they generally range from $0.5 to 2.0M each) or convert to the full license with all the available patents and pay the difference of what you've paid already and the full price of $27.5M." Hulse Decl., Exh. 2 at 1 (emphasis added).

Thus, the September 2007 email merely offered Cepheid a list of available patents so that Cepheid could choose which (if any) additional patents it might be interested in licensing in view of its business goals. The email does not single out the '155 patent, nor identify any Cepheid

---

[2] Only three of these communications were identified in the First Amended Complaint. Cepheid relied on the September 12, 2007 email for the first time in its Opposition.

**[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]**

products in need of a license, nor assert that Cepheid was infringing the '155 patent. This email neither created, nor evidenced, any dispute regarding the '155 patent. Nor did it prompt any response by Cepheid regarding the '155 patent. Cepheid's belated reliance on this communication is a futile attempt to bolster its untenable claim for declaratory judgment jurisdiction.

### b. The May 19, 2010 Letter

As RMS pointed out in its opening brief, the May 19, 2010 "Dear Licensee" letter simply informed licensees that two patents in Roche's PCR portfolio would shortly expire, specified the expiration dates of related foreign patents, and identified other U.S. patents that would continue in effect. *See* Motion at 17; Rabinowitz Decl., Exh. 3. It did not single out Cepheid from other licensees in good standing. *Id*. Cepheid does not deny any of this, but now argues that this letter "ominously noted that Roche would 'continue its practice of performing random audits to confirm that all *Licensed Products* are properly identified and reported.'" Opp. at 6, lines 19-21 (emphasis added). But the statement in question was neither "ominous" nor relevant to the '155 patent, so far as Cepheid was concerned. It is undisputed that Cepheid never took a license under the '155 patent. Accordingly, none of Cepheid's products were "Licensed Products" under the '155 patent, and Cepheid had no contractual duty to pay royalties under the '155 patent. An audit to confirm that Cepheid's "Licensed Products" were properly identified and reported would not have implicated the '155 patent in any respect. Cepheid's reliance on this communication is once again a fruitless attempt to manufacture a controversy regarding the '155 patent where none existed.

Both the "Dear Licensee" letter and the September 2007 email included lengthy lists of "patent menus" available for licensing. Neither the "Dear Licensee" letter, nor the September 2007 email contended that Cepheid was obliged to license any of the listed patents, nor did they identify any particular Cepheid products, let alone make any charge of infringement or demand for royalties. Providing a patent menu, without more, has been held not to satisfy the

**[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]**

requirements for declaratory judgment jurisdiction under *MedImmune*. *See, e.g.*, *Applera Corp. v. Michigan Diagnostics*, 594 F. Supp. 2d 150 (D. Mass. 2009).

In *Applera*, the defendants counterclaimed for declaratory judgment of noninfringement as to fifty-five patents, which were listed in a letter that the plaintiffs had sent "advising [defendants] of [plaintiffs'] extensive patent portfolio and notifying [defendants] that [they] *may be infringing* patents owned by [plaintiffs]." 594 F. Supp. 2d at 158 (emphasis added). The parties then exchanged a series of letters discussing whether defendants' products infringed the patents in the portfolio sent to defendants. In holding that there was no case or controversy as to the fifty-five patents, the court noted that the parties' interactions did not include "any specific allegations of infringement" as to the laundry list of patents in the menu. *Id.* at 158-60.

In this case, neither the May 2010 "Dear Licensee" letter, nor the September 2007 email made any reference to infringement by Cepheid. Furthermore, neither document contained any specific reference singling out the '155 patent, or identifying any Cepheid products in need of a license under the '155 patent. Accordingly these communications do not support the existence of declaratory jurisdiction.

### c. The November 9, 2010 Letter

As RMS pointed out, the November 9, 2010 letter did not accuse Cepheid of infringing the '155 patent or identify any allegedly infringing product, but merely stated that RMS *believed* a license under the '155 patent to be necessary for "*certain*" Cepheid products. Motion at 17 (emphasis added); *see also* Rabinowitz Decl., Exh. 12. Cepheid does not deny this. Opp. at 6.

In *Monsanto Co. v. Syngenta Crop Protection, Inc.*, 2008 WL 294291 (E.D. Mo. Jan. 31, 2008), a very similar letter was found inadequate to create a controversy of "sufficient immediacy and reality" to support declaratory judgment jurisdiction. Monsanto premised its declaratory jurisdiction argument on a letter sent by Syngenta's managing patent attorney informing Monsanto of Syngenta's process patent and warning that it would view an attempt by Syngenta to market a new herbicide as "an infringement of its patent." *Id*. The letter also asked for Monsanto's basis for any opinion that the patent was not relevant to Syngenta's product and

**[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]**

demanded a response "within two weeks." *Id.* Finally, the letter invited Monsanto to "consider entering into a licensing agreement" with Syngenta. *Id.* at *1. The court held that such a letter "does not establish a course of conduct that shows a preparedness and willingness to enforce [one's] patent rights" because, for example, "there is no indication that Syngenta has provided Monsanto with a claims construction or an analysis of how Monsanto's . . . product infringes the patent." *Id.* at *6 (citation omitted). Here, the November 9, 2010 letter made no charge of infringement, did not identify any claims of the '155 patent that were said to be infringed, and did not identify any Cepheid products that were said to be infringing. Just as in *Monsanto*, RMS neither provided nor demanded a claim construction or infringement analysis comparing the claims of the '155 patent with any Cepheid products.

Cepheid attempts to distinguish *Monsanto* on the basis that in that case "there was no 'indication that [the patentee] has *demanded* the payment of royalties.'" Opp. at 11, lines 17-20. (brackets in original, emphasis added). However, the *Monsanto* court noted that the patentee sent a letter that "invited [the declaratory plaintiff] to consider entering a licensing agreement or purchasing [the technology] from [the patentee]." 2009 WL 294291, at *1. This is exactly the same type of communication that was sent by RMS to Cepheid in the November 9, 2010 letter. Rabinowitz Decl., Exh. 12 ("We would like to draw your attention to this patent and offer you the opportunity to include it into said License Agreement. There would be a fee for inclusion of said patent, but no change in the existing royalty structure."). The language of this letter in no way "*demanded* the payment of royalty fees."

Cepheid inappropriately relies on *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007) and *ABB Inc. v. Cooper Industries, LLC*, 635 F.3d 1345, 1348 (Fed. Cir. 2011) for the proposition that the November 9, 2010 letter establishes declaratory judgment jurisdiction. Opp. at 10, lines 10-17. In *SanDisk*, a unique combination of facts – not present in the instant case – led to a finding of declaratory jurisdiction. There, ST, the patent-holder, communicated to SanDisk, its competitor, "*specific, identified* activity by SanDisk." 480 F.3d at 1382 (emphasis added). ST presented SanDisk with "a thorough infringement analysis . . .

6

**[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]**

which identified, *on an element-by-element basis*, the manner in which ST believed each of SanDisk's products infringed the specific claims of each of ST's patents." *Id.* During the presentation to SanDisk, ST's experts "liberally referred to SanDisk's present, ongoing infringement of ST's patents and the need for SanDisk to license those patents." *Id.* Finally, ST provided SanDisk with lengthy reports including reverse engineering of certain of SanDisk's products, "and diagrams showing a detailed infringement analysis of SanDisk's products." *Id.* Based on this "studied and determined infringement determination," ST "asserted the right to a royalty." *Id.* Despite Cepheid's attempt to establish a categorical test for declaratory jurisdiction, the court carefully based its analysis on "the facts alleged in this case." *SanDisk*, 480 F.3d at 1382.

Several courts, on similar facts to those present here, have found declaratory judgment jurisdiction to be lacking and have distinguished *SanDisk* based on the immediacy and reality of the controversy created by the unique combination of facts alleged in that case. In *Wooster Brush Co. v. Bercom Int'l, LLC*, No. 5:06CV474, 2008 WL 1744782 (N.D. Ohio Apr. 11, 2008), the court found no declaratory judgment jurisdiction and explained:

> However, [i]n the instant matter, unlike the *SanDisk* case on which defendants rely, there is no evidence [that the patent holder] has made a demand . . . that identifies how any new product infringes specific claims of any of [the] patents. Nor is there any evidence that [the patent holder] has asserted that [plaintiff is] engaged in present, ongoing infringement of . . . patent, or *demanded* that [plaintiff] license the patents, as occurred in *SanDisk*.

*Id*. at *4 (citation and internal quotation marks omitted) (alterations in original, emphasis added));[3] *accord Applera*, 594 F. Supp. 2d at 156 ("the Federal Circuit held in *SanDisk* that an Article III case or controversy giving rise to declaratory judgment jurisdiction existed based upon *substantial and detailed* pre-litigation discussions between the parties about *infringement*

---

[3] Cepheid attempts to distinguish *Wooster Brush* as turning on "whether *all the circumstances* showed there was a case or controversy." Opp. at 11, lines 16-17. But the key "circumstances" present in *Wooster Brush* – that the patentee "made no direct statement regarding infringement," "never provided an infringement analysis to [the declaratory plaintiff]" and "never identified a claim under its patent that had been infringed," 2008 WL 1744782, at *4-5 – are also present here, and compel the same result.

7

**[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]**

and licensing") (emphasis added); *Edmunds Holding Co. v. Autobytel Inc.*, 598 F. Supp. 2d 606, 610 (D. Del. 2009).

Similarly, in *ABB*, the parties had previously litigated and settled the issue of infringement of the patents-in-suit by the declaratory plaintiffs' product and entered into a license agreement under the patents-in-suit for a lump-sum payment. 635 F.3d at 1346. Thereafter, when the plaintiff began outsourcing manufacture of the licensed product to a third party, the patentee sent a letter to the plaintiffs stating that it would act "vigorously to protect its rights" if the plaintiffs attempted to outsource such manufacture to a non-affiliate, and a second letter to the third party manufacturer stating that it would "vigorously defend its rights should [the manufacturer] attempt to make products covered by one or more of [defendants'] patents." *Id.* at 1347. The licensees promptly commenced an action in Federal district court for a declaratory judgment as to their license rights, and subsequently amended their complaint to seek declaratory judgment of non-infringement. *Id*. It was undisputed that a justiciable controversy existed, but the defendant patentees (who had meanwhile commenced a state court action) contended that there was no *patent* dispute but only a state law contract dispute as to which Federal subject matter jurisdiction was lacking since there was no diversity of citizenship. *Id*. at 1346-47. Applying an "all the circumstances" test, the Federal Circuit found that the letters demonstrated a controversy between the parties about whether the declaratory plaintiffs' actions exceeded the scope of the license so as to constitute patent infringement, of "sufficient immediacy and reality" to create Federal declaratory judgment jurisdiction *Id.* at 1348. No similar facts are present here.

Moreover, as RMS pointed out in its opening brief, the fact that Cepheid took no action in response to the November 9, 2010 is compelling real-world evidence that the letter did not create a "substantial controversy" of "immediacy and reality." Motion at 18-19 (citing *Edmunds*, 598 F. Supp. 2d at 609, 610-11). Cepheid wrongly contends that "the Federal Circuit rejected this exact argument in [*Association for Molecular Pathology v. United States Patent &*

**[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]**

*Trademark Office*, 689 F.3d 1303, 1314-5, 1320 (Fed. Cir. 2012) ("*Myriad*")]." Opp. at 12, line 16. But Cepheid misperceives the argument that RMS is making, and misreads *Edmunds*.

RMS did not argue that the November 9, 2010 letter created a justiciable controversy that was dissipated with the passage of time. On the contrary, the November 9, 2010 letter did not create a "substantial" or "immediate" controversy at all, and Cepheid's lack of response – until spurred by extraneous events – is circumstantial evidence of that fact, just as the plaintiff's delay in *Edmunds* "cu[t] against its argument that its alleged controversy with [the patentee] is sufficiently immediate as to require adjudication now." 598 F. Supp 2d at 610-11.

In *Myriad*, by contrast, the patentee's threat of infringement caused substantial and immediate injury to plaintiff Dr. Ostrer by forcing him to cease and desist from performing his allegedly infringing testing activities for the following ten years. 689 F.3d at 1321 ("*Myriad's active enforcement of its patent rights forced Dr. Ostrer . . . to cease performing the challenged BRCA testing services. . . . Since that time, neither the accused activities nor the parties' positions have changed.*") (emphasis added). No such facts are present here. Cepheid has not shown that it ceased or desisted from any actual or planned activities in response to the November 9, 2010 letter and has not shown any concrete injury flowing from that communication. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) *actual or imminent*, not conjectural or hypothetical" (internal citations and quotation marks omitted))*; Myriad*, 689 F.3d at 1318 (applying *Lujan*). Accordingly, Cepheid's attempt to distinguish *Edmunds* based on *Myriad* must fail.

### d. The April 24, 2012 Term Sheet

Although Cepheid failed to mention this fact in its First Amended Complaint, it now concedes that RMS only sent the April 24, 2012 Term Sheet in response to a phone call from Joseph Smith, Esq., the General Counsel of Cepheid. Opp. at 7, lines 5-8; *see also* Motion at 19. This call, not prompted by any activity of RMS, was made nearly 18 months after Cepheid received the November 9, 2010 letter, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

9

**[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The timing of this call – after nearly a year and a half of silence during which Cepheid freely manufactured and sold its products without any interaction with RMS – strongly supports an inference that the April 2012 call was a ploy by Cepheid to elicit a response from RMS in an attempt to manufacture a controversy with respect to the '155 patent.

In fact, the Term Sheet sent by RMS contained no assertion of infringement, no threat of enforcement of patent rights, and no identification of allegedly infringed claims or allegedly infringing products. *See* Rabinowitz Decl., Exh. 13. Cepheid's reliance on this communication as "indicat[ing] that Cepheid products require a license under the '155 patent," Opp. at 7, lines 10-11, is contradicted by the very document on which Cepheid relies.[4]

## 2. Cepheid Misreads the "All-the-Circumstances" Test of *MedImmune*

Cepheid pays lip service to the "all-the-circumstances" inquiry mandated by *MedImmune*, Opp. at 9, line 13, but then contradicts *MedImmune* by relying on a categorical rule, arguing that in November 2010, "RMS asserted rights under the '155 patent based on products sold by Cepheid, for which Cepheid contends it does not need a license. These facts alone establish declaratory judgment jurisdiction." Opp. at 10, lines 8-11. But there is no "bright-line rule for determining whether an action satisfies the case or controversy requirement." *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1336 (Fed. Cir. 2008). Rather, "'[t]he difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree,' and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy." *Id.* (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). Thus, the inquiry must focus on the particular facts relating to subject matter jurisdiction in this case, and in other decided cases with facts sufficiently similar to be persuasive.

---

[4] Where as here, a factual challenge is raised to subject matter jurisdiction under Rule 12(b)(1), the court is "free to hear evidence regarding jurisdiction and to rule on that issue prior to trial, resolving factual disputes where necessary." *Kingman Reef Atoll Invests., L.L.C. v. United States*, 541 F.3d 1189, 1195 (9th Cir. 2008) (citation omitted).

**[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]**

Cepheid inappropriately relies on dicta in a concurring opinion for the proposition that "an invitation to take a license is simply another way of alleging infringement." Opp. at 11, lines 1-2 (citing *SanDisk*, 480 F.3d at 1384 (Bryson, J., concurring)). Judge Bryson was in no way advocating or adopting such a rule, but rather was warning against a slippery slope that "will effect a sweeping change in our law regarding declaratory judgment jurisdiction." 480 F.3d at 1385. Under facts similar to those present here, courts have declined to embark on that slippery slope as Cepheid invites this Court to do. *See, e.g.*, *Monsanto*, 2008 WL 294291, at *1 (patentee's invitation to "consider entering a licensing agreement" did not suffice to create declaratory judgment jurisdiction).

To the contrary, in cases relied on by Cepheid, declaratory judgment jurisdiction was present where the patentees had identified either allegedly infringed patent claims or allegedly infringing products, or both. *See Myriad*, 689 F.3d at 1314-15, 1320 (patentee identified claims covering *BRCA1* gene sequence and methods for detecting alterations in the *BRCA1* sequence, as well as *BRCA1* diagnostic testing services being offered by the recipients and "demanded a royalty from [the declaratory plaintiff] based on his clinical *BRCA*-related activities"); *3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372, 1375 (Fed. Cir. 2012) (patentee identified "3M's Diamond Grade DG product" and promised to send claim charts); *ABB Inc. v. Cooper Indus., LLC*, 635 F.3d 1345, 1347 (Fed. Cir. 2011) (patentee identified declaratory plaintiff's "BIOTEMP" product); *SanDisk*, 480 F.3d at 1375, 1382 (identified claims and specific products); *Zoove Corp. v. StarPound Corp.*, 20012 WL 3580526, at *2, 4 (N.D. Cal. Aug. 17, 2012) (identified plaintiff's "business model" as "utilizing the claimed invention").

In *3M*, the totality of the circumstances illustrated far different facts than those alleged here. In that case, Avery's chief intellectual property counsel contacted 3M's chief intellectual property counsel and "expressly stated that *a specific* product . . . 'may infringe' the [patents-in-suit] and that 'licenses are available.'" *Id.* at 1379. Just two days later, counsel for 3M contacted counsel for Avery and rejected Avery's license offer, to which counsel for Avery responded by stating that "Avery had analyzed [the specific product discussed] with regard to the [patents-in-

11

**[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]**

suit] and that Avery would provide 3M with claim charts." *Id.* Moreover, the parties had a history of litigation with each other. *Id.* at 1374. The court placed significance on the fact that Avery's chief intellectual property counsel, an individual presumably imbued with decision-making authority, initiated the contact and the fact that Avery's statement regarding its analysis of the specific product in relation to the patents-in-suit and provision of claim charts "signaled its intent to escalate the dispute." *Id.* at 1380. Here, none of the communications from RMS were sent by a lawyer with decision-making authority *vis-à-vis* RMS's assertion of its patent rights. Further, RMS did not act in a way to "signal" any escalation of the parties' communications. To the contrary, Cepheid has manufactured and sold its products at all times free from any interference from RMS as to the '155 Patent. *See Prasco,* 537 F.3d at 1338 (uncertainty "from fear that [the patentee] will bring an infringement suit" was "only subjective [and] not an injury or threat of injury" where plaintiff had launched its product without an attempt to restrain it by the patentee (citing *City of L.A. v. Lyons*, 461 U.S. 95 (1983))).

In *Hewlett-Packard v. Acceleron LLC*, 587 F.3d 1358 (Fed. Cir. 2009), the patentee sent a letter identifying its newly-acquired patent as relating to the declaratory plaintiff's "Blade Server" product line. *Id.* at 1362. The Federal Circuit rejected the plaintiff's argument that this sufficed to establish declaratory judgment jurisdiction or that the case fell squarely within the standard set by *SanDisk*. *Id.* at 1361 ("We see nothing 'squarely' about this case and *SanDisk* does not support [the plaintiff's] proposition."). Applying the totality of the circumstances test, the *Acceleron* court found that declaratory judgment jurisdiction was present based on additional factors not present here. *Id.* at 1363, 1364 (the patentee was a "non-competitor patent holding company," that "without enforcement receives no benefits from its patent" and that had "rejected the plaintiff's 120-day standstill proposal"); *id.* at 1360-61 (the plaintiff commenced its declaratory judgment action 33 days after being contacted by the patentee). Similarly, in *Zoove*, the court noted that the defendant had "exhibited its willingness to enforce its patent rights against" the plaintiff and stated that "[f]or the last six years, [defendant's] entire business has been the monetization of its patents, and [plaintiff] is apparently its only target." 2012 WL

**[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]**

3580526, at *5. Cepheid omits two important facts in its parenthetical characterization of *Zoove*. First, the patentee did not merely send an email "inviting" license negotiations, as Cepheid contends. Opp. at 12, lines 6-9. Rather, the patentee openly expressed its view that the plaintiff's "products and services would infringe" (if the patent application was granted). 2012 WL 3580526, at *4. Second, the email in *Zoove* that Cepheid references overtly and expressly stated that "there is no way for anyone to compete directly with [plaintiff's] current business model without utilizing the claimed invention." *Id*. "[T]he logical inference from that statement is that [plaintiff] also infringes the patent." *Id*. Nothing in RMS's communications even approaches those statements in *Zoove*.

### 3. Even if Article III Jurisdiction Exists, the Court Should Dismiss Counts III and IV of the First Amended Complaint in Its Discretion

The Federal Circuit has affirmed discretionary dismissal of declaratory judgment claims in cases where "the declaratory judgment complaint [w]as a tactical measure filed in order to improve [the plaintiff's] posture in . . . ongoing negotiations," *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 815 (Fed Cir. 1996), *abrogated in part on other grounds by MedImmune*, 549 U.S. 118, and where the declaratory plaintiff "had used a ploy to attempt to generate jurisdiction," *Innovative Therapies, Inc. v. Kinetic Concepts*, 599 F.3d 1377, 1384 (Fed. Cir. 2010).

Here, Cepheid contacted RMS in April 2012 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ concerning the '375 patent, despite having freely manufactured and sold its products at all times and without contact from RMS over the previous 18 months. Moreover, Cepheid's opposition reveals a second ulterior motive for commencing the present declaratory judgment action on August 18, 2012: "to preserve its unenforceability claim against the '155 patent" by bringing suit in order to foreclose RMS from invoking the "supplemental examination" procedure that would become available from September 16, 2012 under the America Invents Act. Opp. at 14-15.

In sum, Cepheid's strategic reasons for filing this action as to the '155 patent "d[o] not comport with the purposes of the Declaratory Judgment Act" and the Court should decline to

**[CONFIDENTIAL – SUBMITTED FOR FILING UNDER SEAL]**

exercise declaratory judgment jurisdiction. *Innovative Therapies*, 599 F.3d at 1384; *see EMC*, 89 F.3d at 815.

Moreover, Cepheid's public policy argument is unsupported by precedent, and would create an exception that swallows the rule. Allegations of invalidity and unenforceability do not suffice to create declaratory judgment jurisdiction where none exists, or to foreclose the Court from exercising its discretion to decline to exercise declaratory judgment jurisdiction. Article III limitations, and the discretion conferred on the Court by the Declaratory Judgment Act, are not so easily circumvented by artful pleading.

### III. CONCLUSION

For the reasons set forth above and in RMS's opening brief, Counts I and II of the First Amended Complaint should be stayed pending completion of the arbitration pending in Switzerland and the parties should be ordered to submit a joint status report within 30 days after ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Counts III and IV should be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), or else in the exercise of the Court's discretion.

Dated: December 7, 2012        FRIED, FRANK, HARRIS, SHRIVER
                                                             & JACOBSON LLP

                                                             /s/ Stephen S. Rabinowitz
                                                          Stephen S. Rabinowitz
                                                          Attorneys for Defendant
                                                          ROCHE MOLECULAR SYSTEMS, INC.