UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CEPHEID, | No. C-12-4411 EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANT'S MOTION TO STAY AND MOTION TO DISMISS** |
| ROCHE MOLECULAR SYSTEMS, INC., *et al.*, | |
| Defendants. | **(Docket No. 50)** |
| _____/ | |

## I. **INTRODUCTION**

Plaintiff brought this suit for declaratory judgment seeking that this Court declare that two of Defendants' patents (the '375 patent and the '155 patent) are invalid and have expired, and that Plaintiff has not infringed those patents. Plaintiff further seeks a declaration that the '155 patent is unenforceable due to inequitable conduct. In the motion now pending, Defendant Roche Molecular System asks that the claims as to the '375 patent be stayed pending the outcome of related arbitration proceedings, and that the claims as to the '155 patent be dismissed for lack of subject matter jurisdiction because there is no Article III standing. Docket No. 50. Both parties have filed associated motions to file their briefs and exhibits under seal, which this Court granted on December

///
///
///
///
///

13, 2012. On December 28, 2012, Plaintiff filed a motion for leave to file a post-hearing statement on an issue raised by this Court in the hearing on this motion.[1] Docket No. 61.

## II. FACTUAL & PROCEDURAL BACKGROUND

In 2004, Plaintiff Cepheid entered a licensing agreement with Defendant Roche Molecular Systems ("RMS") and Defendant R. Hoffmann-La Roche Ld. ("Hoffman") (together "Roche" or "Defendants"). First Amended Complaint ("FAC") ¶ 10. The terms of this agreement granted Plaintiff certain license rights to a number of Roche-owned U.S. Patents on chemical processes used in polymerase chain reaction ("PCR") diagnostic testing. *Id.* The patents covered by the licensing agreement included U.S. Patent No. 5,804,375 ("the '375 patent"), but not U.S. Patent No. 6,127,155 ("the '155 patent"). *Id.* The parties executed a revised agreement in 2005, which again covered the '375 patent but not the '155 patent. Rabinowitz Declaration in Support of Defendant's Motion ("Rabinowitz Decl."), Ex. 2 § 1.13, Appx. 1.

### A. The Dispute Regarding the '375 Patent

Under the terms of the 2005 licensing agreement, Plaintiff was to pay Defendants royalties for the sale of Plaintiff's products made with the covered patented technology. Rabinowitz Decl. Ex. 2 §§ 4.4-4.4. Plaintiff had the option of terminating the agreement with respect to any or all of the licensed patents at any time by providing Defendants with written notice. *Id.* § 8.2(a). The agreement further provided that

> In the event of the termination of any license, in whole or in part, under this Agreement, the manufacture and/or Sale by the CEPHEID Sellers of products covered by such license shall cease immediately to the extent that such manufacture and/or Sale no longer is licensed as a result of such termination, except that such products in inventory as of the date of such termination may be Sold in accordance with the terms and subject to the conditions and restrictions of this Agreement for a period of one hundred eighty (180) days following such termination and royalties shall be due and payable on the Net Sales of such products in accordance with the terms and conditions of this Agreement.

---

[1] Defendant filed an opposition to Plaintiff's request to file a post-hearing statement on January 4, 2013. Docket No. 62. In addition to arguing that Plaintiff was not entitled to file the post-hearing statement, Defendant filed a short response to the statement, and requested that this Court consider the response if it were to grant Plaintiff's request. This Court **GRANTS** Plaintiff's request for leave to file a post-hearing statement. This Court will consider the arguments offered in Plaintiff's statement and Defendant's response as they are relevant to the analysis below.

2

*Id.* § 8.2(e).

The 2005 licensing agreement contains an arbitration clause stating that if a dispute "relating to or arising out of any provision of [the] Agreement," cannot be resolved through specified informal channels, it shall be subject to final and binding arbitration. Rabinowitz Decl. Ex. 2 §§ 11.1, 11.2. The agreement provides that the arbitration shall be conducted pursuant to the Rules of Conciliation and Arbitration of the International Chamber of Commerce in Paris. *Id.* § 11.2. The agreement specifies how the arbitrators shall be chosen, and that the proceedings shall be held in the English Language in Zurich, Switzerland. *Id.*

In a letter dated May 19, 2010, RMS informed all of its licensees that two patents in its portfolio would be expiring on August 6, 2010. Rabinowitz Decl. Ex. 3. The letter also noted the expiration dates of other patents in RMS's portfolio. *Id.* The letter noted that the '375 patent would expire on September 8, 2015, and that the '155 patent would expire on October 3, 2017. *Id.* at 2.

On July 30, 2010, Plaintiff sent Defendants a letter terminating the licensing agreement as to the '375 patent. Rabinowitz Decl. Ex. 4. The letter stated that "[p]ursuant to Section 8.2(e) of that Agreement, any royalty obligation under the '375 patent will end at midnight on August 5, 2010 concurrently with expiration of the other patents in the '375 patent family." *Id.* This letter did not terminate the licensing agreement as to any of the other patents Plaintiff was then licensing from Defendants. *Id.*

Defendants responded with a letter on August 31, reaffirming that the '375 patent did not expire until 2015, and that any of Plaintiff's products that used the technology of the '375 patent still required a licensing agreement. Rabinowitz Decl. Ex. 5. The letter stated that per the termination, Plaintiff no longer had rights to manufacture or sell products covered by the patent with the "narrow exception contained in article 8.2(e)." *Id.* at 1. Defendants noted that they would be conducting an assessment of whether certain products of Plaintiff and its affiliates infringed on the Patent, and would inform Plaintiff when the assessment was complete. *Id.* at 2. The parties dispute whether Plaintiff payed royalties as required under the licensing agreement during the 180 day period following the termination of the license for the '375 patent. Def.'s Mot. at 6; Pl.'s Opp. at 4 n.3.

Defendants requested arbitration with the International Chamber of Commerce ("ICC") in Zurich on August 9, 2011. Rabinowitz Decl. Ex. 7 at 6. In the arbitration proceedings, Defendants are contending that Plaintiff has continued to make and sell products that use the technology covered by claim 21 of the '375 patent, and that in doing so Plaintiff is breaching Section 8.2(e) of the licensing agreement. *Id.* at 14-15, ¶¶ 6, 12. Plaintiff contends that none of its products were covered by claim 21 of the '375 patent when it terminated the licensing agreement, and that none of its products have infringed upon claim 21 of the '375 patent. *Id.* at 16, ¶ 2(a). Plaintiff further contends that the entirety of the '375 patent is invalid, and that the term of the '375 patent cannot extend beyond August 5, 2010. *Id.* at 16-17, ¶¶ 2(b)-(c).

On September 21, 2011, Plaintiff informed the ICC that it was contesting the jurisdiction of the Arbitral Tribunal under Article 6(2) of the ICC Rules. Rabinowitz Decl. Ex. 7 at 7. Plaintiff's position was that the arbitration clause in the licensing agreement applied only to contractual claims arising during the existence of the licensing agreement, and that Defendant's arbitration claims were non-contractual and arose after Plaintiff had terminated the licensing agreement as to the '375 patent. *Id.* at 12. Additionally, Plaintiff terminated the entirety of the licensing agreement between the parties on October 20, 2011. Rabinowitz Decl. Ex. 14. Article 6(2) of the ICC's Rules provides that

> if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the [International Court of Arbitration] may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is *prima facie* satisfied than an arbitration agreement under the Rules may exist. In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself. If the [International Court of Arbitration] is not so satisfied, the parties shall be notified that the arbitration cannot proceed.

Rabinowitz Decl. Ex. 1 at 7 (ICC Rules of Arbitration). The issue of jurisdiction was referred to the ICC court, which ruled on December 16, 2011 that there was a prima facie case of arbitral jurisdiction, and that the Arbitral Tribunal would thus decide the existence and of scope of jurisdiction. Rabinowitz Decl. Ex. 7 at 8, 12. A procedural timetable set in the arbitration proceedings indicates that a preliminary decision on the issue of jurisdiction is expected sometime in 2013. Rabinowitz Decl. Ex. 11.

4

Throughout much of 2012, the parties worked on drafting a procedural timetable and Terms of Reference for the arbitration. Rabinowitz Decl. Ex. 7 at 8-11. Though the parties were able to stipulate to almost all provisions for the Terms of Reference, they were unable to stipulate to a confidentiality provision that would govern the arbitration proceedings. *Id.* On August 15, 2012, over Plaintiff's objections, the Arbitral Tribunal determined that the ongoing dispute about the confidentiality provision did not prevent the signing of the Terms of Reference, and stated that the Terms of Reference would be sent for execution. *Id.* at 10-11. Plaintiff refused to sign the terms of reference because they did not contain any binding agreement about the confidentiality of the proceedings. *Id.*

B.  The Dispute Regarding the '155 Patent

The '155 patent has apparently never been the subject of a licensing agreement or formal legal proceedings between the parties, but Plaintiff alleges that Defendants have threatened to assert their rights under the patent against Plaintiff in various ways.

The first communication regarding the '155 patent that Plaintiff references is a September 2007 draft licensing agreement that Defendants sent Plaintiff. Pl.'s Opp. at 6; Hulse Declaration in Support of Plaintiff's Opposition ("Hulse Decl.") Ex. 2. RMS's Head of Licensing emailed Plaintiff a draft licensing agreement with an attached list of Defendant's patents, and noted that Plaintiff "can either add individual patents - each has its own price . . . or convert to the full license with all the available patents and pay the difference of what you've paid already and the full price of $27.5M." *Id.* at 1. The draft agreement lists eight "foundational patents" and ninety seven patents covering "improvements." *Id.* at 37-45. The '155 patent is one of the listed "improvement" patents. *Id.* at 41. Plaintiff points to no specific mention of the '155 patent in the exchange about the draft licensing agreement.

The second communication Plaintiff points to is the May 19, 2010 letter informing all of Defendants' licensees of two expiring patents, and informing the licensees of the expiration dates for non-expiring patents. Rabinowitz Decl. Ex. 3. The letter states that the '155 patent would expire on October 3, 2017. *Id.* at 2. The letter also stated that

5

> We recommend that your technical and legal/patent staff determine which of your PCR products have been and continue to be subject to valid patents of Roche's portfolio. Roche will continued its practice of performing random audits to confirm that all Licensed Products are properly identified and reported.

*Id.* at 1. In neither the 2007 draft licensing agreement (or accompanying communication) nor the May 29, 2010 letter did RMS assert that any of Cepheid's products were subject to the '155 patent.

The third communication, and the first specifically highlighting the '155 patent, is a November 9, 2010 letter from RMS to Plaintiff stating that RMS had recently conduced a review of Plaintiff's products. Rabinowitz Decl. Ex. 12.

> In the course of our review, it has come to our attention that the above referenced License Agreement does not contain [the '155 patent] as Licensed Patent, which we believe is necessary for certain of your products. We would like to draw your attention to this patent and offer you the opportunity to include it into said License Agreement. There would be a fee for inclusion of said patent, but no change in the existing royalty structure.
>
> Please contact me at your earliest convenience to discuss this matter. In the event that we do not hear from you before November 30, 2010, we will assume you have declined our offer for this inclusion.

*Id.* The letter contained no discussion of the possibility of infringement beyond the quoted text, did not explain the basis of any claim of infringement, did not identify any accused products, and did not mention any threat of legal proceedings. *Id.* Plaintiff did not respond to this letter, and it appears that Defendants issued no further communication with Plaintiff about the '155 patent for the next year and a half. Pl.'s Mot at 7.

Finally, Plaintiff points to an April 24 term sheet RMS sent Plaintiff concerning the potential licensing of the '155 patent, along with two other patents. Rabinowitz Decl. Ex. 13. The parties agree that RMS sent Plaintiff the term sheet in response to a call Plaintiff had placed to RMS, though they disagree about the characterization of the call. Plaintiff states that it "called RMS to determine whether RMS still asserted that [Plaintiff] requires a license" for the '155 patent. Pl.'s Mot. at 7. Defendant RMS notes that this call was placed "shortly after" the ICC Court's December 2011 ruling finding *prima facie* arbitral jurisdiction, and states that Plaintiff "telephoned RMS's Head of Licensing concerning a license under the '155 patent" in order to "manufacture a controversy" over the '155 patent. Def.'s Mot. at 8-9. The term sheet was sent as an attachment to

an email that said simply: "Hi Joe. Thanks for the call last week. Here is a draft Term Sheet as we discussed. Best Regards, Monte." Rabinowitz Decl. Ex. 13. The attachment to the email provides terms for licensing three patents, one of which was the '155 patent. *Id.* Plaintiff did not respond to the email and did not engage RMS as to whether its products were in fact covered by the '155 patent. It appears that Plaintiff simply declined to license the '155 patent by failing to respond. The parties had no further communication on the matter prior to Plaintiff's initiation of this litigation. Def.'s Mot. at 9; Pl.'s Opp. at 7.

C.  Plaintiff's Filing of the Case at Bar

Plaintiff filed this suit on August 21, 2012. The first two causes of action pertain to the '375 patent. FAC ¶¶ 17-28. The third and fourth causes of action pertain to the '155 patent. FAC ¶¶ 29-80.

## III. DISCUSSION

A.  Motion to Stay Counts I and II

Defendant RMS argues that Counts I and II of the first amended complaint should be stayed pending the outcome of the currently pending arbitration. Def.'s Mot. at 9-14. Defendant points to the Federal Arbitration Act ("FAA"), which provides that contractual arbitration clauses are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. When a dispute covered under an arbitration clause is brought in a suit in federal court, the court must stay the action upon application of any of the parties. 9 U.S.C. § 3. Additionally, under federal patent law, agreements containing arbitration provisions are "valid, irrevocable, and enforceable, except for any grounds that exist at law or in equity for revocation of a contract." 35 U.S.C. § 294.

In its response to RMS's motion, Plaintiff did not contest a stay, but initially argued that the stay of Counts I and II in this action should continue only until the Arbitral Tribunal issues its decision on jurisdiction. Pl.'s Opp. at 8-9. At the hearing on this matter, however, Plaintiff conceded that, rather than having the stay expire automatically when the Tribunal issued the jurisdiction decision, it was appropriate for Plaintiff to bring a motion to lift the stay if and when the Arbitral Tribunal issues a decision on the issue of jurisdiction that is favorable to Plaintiff.

7

Accordingly, Counts I and II of this action are **STAYED** until further order of this Court. The parties are directed to update this Court within 30 days of the issuance of the Arbitral Tribunal's decision on the issue of jurisdiction.

B. <u>Motion to Dismiss Counts III and IV</u>

Defendant RMS's motion asks this Court to dismiss Counts III and IV, which pertain to the '155 patent, for lack of subject matter jurisdiction. Def.'s Mot. at 14-20. In the alternative, Defendant asks that even if this Court finds that it has proper jurisdiction over Counts III and IV, that it dismiss these counts in exercise of its discretion under the Declaratory Judgment Act. *Id.* at 20-21.

"Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.' " *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982).

> To satisfy the "case" or "controversy" requirement of Article III, which is the "irreducible constitutional minimum" of standing, a plaintiff must, generally speaking, demonstrate that he has suffered "injury in fact," that the injury is "fairly traceable" to the actions of the defendant, and that the injury will likely be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 162 (1997) (internal citations omitted). "Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a [Federal] Rule [of Civil Procedure] 12(b)(1) motion to dismiss." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121–22 (9th Cir.2010). "A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir.2003).

> The Declaratory Judgment provides that, "In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The phrase "a case of actual controversy" in the Act refers to the types of "cases" and "controversies" that are justiciable under Article III of the U.S. Constitution. *Aetna Life Ins. v. Haworth*, 300 U.S. 227, 239-40 (1937).

*3M Co. v. Avery Dennion Corp.*, 673 F.3d 1372, 1376 (Fed. Cir. 2012). Standing to seek declaratory relief thus requires justiciability under Article III.

In 2007, the Supreme Court rejected the Federal Circuit's prior rule that in order to establish standing in declaratory judgment actions against patent holders, the plaintiff must show a "reasonable apprehension of suit." *MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 132 n.11 (2007). Instead, the Court held that the critical issue for determining whether there is standing in such cases is "is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 127. In order to establish standing, the Supreme Court has "required that the dispute be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Id.* at 127 (quoting *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240-41 (1937)). The Court has recognized that this is not a bright line inquiry, but dependant upon the facts in each case. *Id.*

Since *Medimmune*, a number of Federal Circuit cases have applied this fact-based, "all the circumstances" test to determine when standing exists to seek declaratory judgment of non-infringement or the invalidity of a patent. In so doing, courts have looked at a number of factors, including the depth and extent of infringement analysis conducted by the patent holder, *SanDisk Corp. v. STMicroelectronics, Inc*., 480 F.3d 1372, 1374-76 (Fed. Cir. 2007); the strength of any threatening language in communications between the parties, *ABB Inc. v. Cooper Indus., LLC*, 635 F.3d 1345, 1346-47 (Fed. Cir. 2011); whether the patent holder imposed a deadline to respond, *Hewlett-Packard Co. v. Acceleron LLC,* 587 F.3d 1358, 1362-63 (Fed. Cir. 2009); any prior litigation between the parties, *id.*; the patent holder's history of enforcing the patent-in-suit, *Micron Tech., Inc. v. Mosaid Technologies, Inc*., 518 F.3d 897, 899 (Fed. Cir. 2008); whether the patent holder's threats have induced the alleged infringer to change its behavior; *Ass'n for Molecular Pathology v. U.S. Patent & Trademark Office*, 689 F.3d 1303, 1318 (Fed. Cir. 2012) *cert. granted on other grounds*, 12-398, 2012 WL 4508118 (U.S. Nov. 30, 2012) ("*Myriad*"); the number of times

the patent holder has contacted the alleged infringer, *Hewlett-Packard Co., supra*, 587 F.3d at 1364; *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1334 (Fed. Cir. 2008); whether the patent holder is simply a holding company with no sources of income other than enforcing patent rights, *id.*; whether the patentee refused to give assurance it will not enforce its patent, *Prasco*, *supra*, 537 F.3d at 1341; whether the patent holder has identified a specific patent and specific infringing products, *id.*; *Applera Corp. v. Michigan Diagnostics, LLC*, 594 F. Supp. 2d 150, 158-60 (D. Mass. 2009), the extent of the patent holder's familiarity with the product prior to the suit, *Prasco*, 537 F.3d at 1334; *Innovative Therapies, Inc. v. Kinetic Concepts, Inc*., 599 F.3d 1377, 1380 (Fed. Cir. 2010) *cert. denied*, 131 S. Ct. 424 (U.S. 2010); the length of time transpired after the patent holder assert infringement, *Ass'n for Molecular Pathology v. U.S. Patent & Trademark Office*, 689 F.3d 1303, 1321 (Fed. Cir. 2012); and whether communications initiated by the declaratory judgment plaintiff have the appearance of an attempt to create a controversy in anticipation of filing suit, *Innovative Therapies*, 599 F.3d. at 1381.

Even if there is a case or controversy under Article III, "district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372, 1376 (Fed. Cir. 2012) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995)).

With respect to Article III standing, a review of some of the cases applying the rule is instructive.

1. <u>Cases Finding Standing</u>

In *SanDisk Corp. v. STMicroelectronics, Inc.*, the plaintiff brought an action for declaratory judgment of non-infringement after the parties had engaged in extended detailed discussions about the possibility of a cross-licensing agreement. 480 F.3d 1372, 1374-76 (Fed. Cir. 2007). At one licensing meeting, the defendant's vice president of intellectual property and several technical experts gave a four to five hour presentation that included a detailed analysis of how the plaintiff's products allegedly infringed various of the defendant's patents. *Id.* at 1375. At the end of the presentation, the defendant's vice president specifically disclaimed any intention to bring suit for

1  infringement. *Id.* at 1376. The Federal Circuit nonetheless found that there was a justiciable

2  controversy because the defendant had "engaged in a course of conduct that show[ed] a

3  preparedness and willingness to enforce its patent rights." *Id.*.3d at 1383. The court noted that

> In the context of conduct prior to the existence of a license, declaratory judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee. But Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do. We need not define the outer boundaries of declaratory judgment jurisdiction, which will depend on the application of the principles of declaratory judgment jurisdiction to the facts and circumstances of each case.

*Id.* at 1380-81.

The Federal Circuit has found subject matter jurisdiction in some cases where the declaratory judgment defendant's preparation was not as extensive as in *ScanDisk*. For example, in *ABB Inc. v. Cooper Indus., LLC*, the defendant wrote a letter indicating that it would "vigorously" enforce its rights under the patent-in-suit and a related licensing agreement. 635 F.3d 1345, 1346-47 (Fed. Cir. 2011). The licensing agreement had been the result of prior litigation between the parties claiming that the product in question infringed upon the defendant's patents. *Id.* at 1346. The court found that under these circumstances, the warning letters to the plaintiff and its contractor were sufficient to create standing to seek declaratory judgment. *Id.* at 1349.

Similarly, in *Micron Tech., Inc. v. Mosaid Technologies, Inc.*, the court found a justiciable controversy based on several warning letters suggesting that the plaintiff license the defendant's technology. 518 F.3d 897, 899 (Fed. Cir. 2008). In that case, the defendant had sent similar letters to other companies in the same industry, and had then systematically begun litigation against the various companies, ultimately obtaining various licensing agreements as part of settlement of the litigation. *Id.* at 899-900. Though the declaratory judgment suit was not filed until four years after the defendant sent the last warning letter, the court held that this did not undermine the conclusion that the plaintiff had standing because in the intervening time, the defendant had been occupied with pursuing litigation and licensing agreements with the other major companies in the field. *Id.* at 901.

11

*See also Ass'n for Molecular Pathology v. U.S. Patent & Trademark Office*, 689 F.3d 1303, 1318 (Fed. Cir. 2012) *cert. granted on other grounds*, 12-398, 2012 WL 4508118 (U.S. Nov. 30, 2012) (internal citations omitted) ("*Myriad*") (finding a justiciable controversy even when ten years had passed since the defendant's warning letter to the plaintiff, when the letter had resulted in the plaintiff contracting with the defendant rather than perform the allegedly infringing tests himself during the intervening years).

In *Hewlett-Packard Co. v. Acceleron LLC*, the court found standing to seek declaratory judgment against a defendant patent holding company that had sent a letter to "call [the plaintiff's] attention to" one of the defendant's patents that "relates to" a specified line of the plaintiff's products, and had later sent a follow up letter. 587 F.3d 1358, 1360 (Fed. Cir. 2009). The court noted that while "a communication from a patent owner to another party, merely identifying its patent and the other party's product line, without more, cannot establish adverse legal interests between the parties, let alone the existence of a 'definite and concrete' dispute," nor could standing "be defeated simply by the stratagem of a correspondence that avoids the magic words such as 'litigation' or 'infringement.'" *Id.* at 1362. The court found the dispute to be justiciable, pointing to the fact that the patentee had twice contacted the plaintiff making an implied assertion of rights against specific products under a specific patent. *Id.* at 1364. The court also found it significant that the defendant was solely a licensing entity, and that it received no benefits from patents without enforcing them. *Id.*

The case most closely on point is *3M Co. v. Avery Dennison Corp*. There, the court found engaging in informal discussions could be sufficient to create a justiciable controversy even if the defendant did not provide a detailed infringement analysis or provide deadlines to respond. 673 F.3d 1372, 1376 (Fed. Cir. 2012) (remanding to the district court to make findings of fact on disputed issues relating to the standing question). According to the plaintiff, the defendant's chief intellectual property counsel had telephoned the plaintiff's chief intellectual property counsel and stated that one of plaintiff's products "may infringe" certain specified patents of the defendant's, and that licenses were available. *Id.* at 1374-75. The plaintiff rejected the offer to license the patents, and inquired whether the defendant had any specific information as to how plaintiff's product

12

infringed the patents. *Id.* at 1375. The defendant represented that it had performed an infringement analysis of the product, and offered to send claim charts, but never did. *Id.* Over a year later, the plaintiff filed suit seeking declaratory judgment. *Id.* The court found that if the facts were as the plaintiff alleged, there would be standing, and held that the fact that defendant's counsel had allegedly "employed the term 'may infringe' instead of 'does infringe' is immaterial in light of his offer to license the . . . patents, his representation that [the defendant] had analyzed the [allegedly infringing products], and his statement that claim charts would be forthcoming." *Id.* at 1379. The court also noted that "the passage of time does not counsel against finding declaratory judgment jurisdiction if the relevant circumstances surrounding the patentee's assertion of patent rights have not changed." *Id* at 1380-81 (internal quotation marks and citations omitted). The court's finding of standing was predicated on the specific context of the interactions between the parties, including a history of Avery enforcing its patent rights against 3M, Avery's refusal to grant 3M a covenant not to sue, unilateral initiation of licensing discussions by Avery, the lack of any indication that 3M used communications as part of an attempt to manufacture jurisdiction, and Avery's representation that it had analyzed the specific product of 3M and would send claim charts, signaling Avery's "intent to escalate the dispute." 673 F.3d at 1380. Given that context, the Court found that Avery effectively charged 3M with infringement and demonstrated its intent to enforce its patent rights.

2. <u>Cases Finding No Standing</u>

In *Prasco, LLC v. Medicis Pharm. Corp.*, the Federal Circuit found that the plaintiff lacked standing to bring an action for declaratory judgment where the defendant had never contacted the plaintiff about potential infringement or licensing. 537 F.3d 1329 (Fed. Cir. 2008). Prior to the suit, the defendant had been unaware of the product in question. *Id.* at 1334. The defendant had previously sued the plaintiff alleging that another of plaintiff's products infringed on an unrelated patent, and had a practice of marking its products with the applicable patent numbers. *Id.* at 1340. The court held, however, that this was insufficient to create a justiciable controversy (*id.* at 1341) because "the defendants have not accused [the plaintiff] of infringement or asserted any rights to [the plaintiff's product], nor have they taken any actions which imply such claims." *Id.*

In *Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 599 F.3d 1377, 1380 (Fed. Cir. 2010) *cert. denied*, 131 S. Ct. 424 (U.S. 2010), employees of the plaintiff placed unsolicited calls to defendant's employees, and asked them for their impressions of whether the defendant would bring an infringement suit based on a product the plaintiff was about to release. *Id.* at 1380-81. Though the defendant's employees made statements indicated that they believed that the defendant would likely bring suit, these were not made after a thoughtful analysis of the applicable patent and product, and it was not clear the employees had the authority to make decisions about bringing infringement suits in any case. *Id.* The district court had characterized the conversations "as a 'sub rosa' effort to create jurisdiction 'by initiating telephone conversations to employees of the patentee who were not in decision-making positions and who were not informed of the real purpose behind the conversations.'" *Id.* at 1381. The Federal Circuit agreed that they did not create a controversy of sufficient "immediacy and reality" as to create jurisdiction. *Id.*

In *Monsanto Co. v. Syngenta Crop Prot., Inc.*, the court found that there was no justiciable controversy where the defendant had sent only a single letter to the plaintiff asking the plaintiff to refrain from recommending allegedly infringing uses of its product, and where the defendant had not provided an analysis of alleged infringement, nor had it demanded payment of royalties. 4:07-CV-543 CEJ, 2008 WL 294291, at *6 (E.D. Mo. Jan. 31, 2008). In *Applera Corp. v. Michigan Diagnostics, LLC*, the court found no justiciable controversy where the defendant recommended that the plaintiff review the all of defendant's patents, but never specifically identified which patents it alleged were infringed. 594 F. Supp. 2d 150, 158-60 (D. Mass. 2009). The defendants in *Wooster Brush Co. v. Bercom Int'l, LLC*, did identify a specific patent that it claimed the plaintiff's product infringed, but after the plaintiff responded with a detailed analysis showing non-infringement, the parties had no further communication until the suit was filed. 5:06CV474, 2008 WL 1744782, at *4 (N.D. Ohio Apr. 11, 2008). The court found that there was no justiciable controversy. *Id.* In *Edmunds Holding Co. v. Autobytel Inc.*, the defendant had sued other companies similar to plaintiff - including plaintiff's customers - but had taken no specific actions against the plaintiff. 598 F. Supp. 2d 606 (D. Del. 2009).

14

### 3. Application

In the case at bar, Plaintiff points to four communications that it alleges support a finding of standing. The first two communications alone certainly would not be sufficient to show a justiciable controversy. Neither specifically focused on the '155 patent, but listed it among numerous other patents held by Defendant. The September 2007 draft licensing agreement, for example, listed the '155 patent along with over 100 other patents, and does not highlight it in any way, or suggest that it might be of particular interest to Plaintiff. Hulse Decl. Ex. 2. The May 2010 letter was sent to all licensees, not just Plaintiff, and is primarily concerned with informing the licensees of two other expiring patents. Rabinowitz Decl. Ex. 3. The '155 patent is listed along with fifteen other non-expiring patents; Defendant noted that it does not expire until 2017. *Id.* Neither communication suggests that any of Plaintiff's products are covered by the '155 patent.

The November 2010 letter is the first communication which calls specific attention to the '155 patent. That letter, which Defendant's head of licensing sent to Plaintiff's General Counsel, indicates that after an "assessment" of Plaintiff's products, Defendant concluded that a license for the '155 patent "is necessary for certain of [Plaintiff's] products." Rabinowitz Decl. Ex. 12. Though the letter does not specifically allege infringement or a detailed analysis of any of Plaintiff's products, the language of the letter suggests that Defendant had conducted some level of analysis and came to the conclusion that one or more of Plaintiff's products infringed. The letter provided a specific deadline for Plaintiff to respond to the offer to license the '155 patent. The letter does not specifically identify which of Plaintiffs products allegedly infringe the '155 patent. Plaintiff did not respond by the deadline provided, and Defendant took no further action related to the '155 patent until Plaintiff initiated contact a year and a half later.

The final communication, in April 2012, was a term sheet Defendant sent Plaintiff, apparently at Plaintiff's request, providing terms for the licensing of three of Defendant's patents, including the '155 patent. While Plaintiff's initiation of this communication may not be as transparent an attempt to create a justiciable controversy as in *Innovative Therapies*, the fact that Plaintiff rather than Defendant initiated this communication undermines the argument that this communication is evidence of Defendant's intent to enforce its patent rights against Plaintiff. 599

15

1  F.3d at 1380-81. There is no indication that Defendant would have taken steps to enforce the '155
2  patent against Plaintiff, or even reopened the conversation about a licensing agreement, absent
3  prompting from Plaintiff. Further, Plaintiff did not respond to Defendant's email, did not attempt to
4  negotiate with Defendant, and did not request further information about why Defendant believed
5  Plaintiff's products required a license for the '155 patent. This lack of follow up gives rise to the
6  appearance that the entire exchange was contrived and initiated by the Plaintiff in contemplation of
7  litigation.

8  Under the fact-based analysis of *Medimmune*, no one factor is dispositive in determining
9  whether a declaratory judgment plaintiff has standing. In this case, the majority of the factors
10 considered by courts weigh against finding standing. The first two communications cited by
11 Plaintiff raised no suggestion that any of Plaintiff's products infringed the '155 patent, and the last
12 communication was elicited by Plaintiff under circumstances suggesting preparation for this
13 litigation. The November 2010 letter, while it identified the '155 patent specifically and stated that
14 Defendants believed a license was "necessary" for some of Plaintiff's products, did not identify the
15 allegedly infringing products. Defendants provided no claims charts, and did not indicate that they
16 had performed a detailed infringement analysis. The letter made no explicit allegations of
17 infringement, and communicated no threat of legal action. Defendants initiated no follow up
18 attempts to enforce their rights under the '155 patent against Plaintiff, even in the midst of heated
19 litigation on the '375 patent. The parties had not previously engaged in litigation over the '155
20 patent, and Defendants were not engaged in a larger pattern of litigation on the patent. Plaintiff has
21 not refrained from manufacturing or selling any of its products on reliance on threats from
22 Defendants. Taken together, there is no indication that Defendants "engaged in a course of conduct
23 that show[ed] a preparedness and willingness to enforce" their rights under the '155 patent.
24 *SanDisk*, 480 F.3d at 1383. There is no indication that Defendants intended "to escalate the
25 dispute." *3M Co. v. Avery Dennison Corp.*, 673 F.3d at 1380.

26 In its supplementary filing, Plaintiff cites to several cases to support its argument that the
27 ongoing controversy over the '375 patent supports a finding of standing to seek declaratory
28 judgement with regards to the '155 patent. Docket No. 61 Ex. A at 2. These cases do indicate that

litigation involving other patents or different alleged infringing parties can support a finding of standing. *See Hewlett-Packard*, 587 F.3d at 1364 n.1 ("A history, or the lack thereof, of litigating in the industry can certainly be a factor to be considered."); *Plumtree Software, Inc. v. Datamize, LLC*, 473 F.3d 1152, 1159 (Fed. Cir. 2006) (finding standing in party because the defendant had previously brought suit for infringement of a patent that "describe[d] a similar technology and share[d] a common specification" with the patent-in-suit); *cf. Vanguard Research, Inc. v. PEAT, Inc.*, 304 F.3d 1249, 1255 (Fed. Cir. 2002) (finding standing in part because the defendant had sued the plaintiff for misappropriation of trade secrets based on use of the same technology that was covered by the patent-in-suit).

    In this case, however, the facts of the '375 patent litigation do not suggest there was a ripe controversy over the '155 patent. To the contrary, they suggest that Defendant was not prepared to bring suit over the '155 patent in the foreseeable future. After the November 2010 letter, Defendants sent no further communications to Plaintiff regarding the '155 patent for the next year and a half. Significantly, even in the midst of a heated legal battle over the '375 patent when Defendant could have invoked the '155 patent as leverage in that battle, Defendants made no move to pressure Plaintiff into licensing the '155 patent, and did not threaten legal action on the '155 patent. Unlike in *3M*, there was no refusal to grant the plaintiff a covenant not to sue or a promise to send claims charts; and as noted above, there was no signaling of an intent to "escalate the dispute." *3M*, 673 F.3d at 1380. Instead, after the relatively unassertive letter of November, 2010, Defendant took no action and initiated no communication.

    The Defendants' silence after the November 2010 letter is telling. While the Federal Circuit has held in several cases that the passage of time between a defendant's threat and the filing of a declaratory action suit does not necessarily defeat standing, these cases involved a more concrete original threat, and in many cases ongoing activity during the elapsed time suggested that the threat of enforcement had not dissipated. In *Micron*, for example, the defendant had spent the four years since sending the plaintiff warning letters pursuing litigation and licensing agreements with the other major companies in the industry. 518 F.3d at 899-900. In *Myriad*, the plaintiff was found to have standing despite a gap of ten years since the defendant's warning letter because the letter had

induced the plaintiff to refrain from performing the allegedly infringing tests. 689 F.3d at 1321. As of the time of the suit, the plaintiff still expressed desire to perform the tests, but was not doing so because of the defendant's threats. *Id.* In both cases, the original threat had specifically identified the infringing product or method. *Id.* at 1320; *Micron*, 518 F.3d at 898. Similarly, according to the plaintiff in *3M*, the defendant had identified a specific allegedly infringing product, and the defendant had represented that it had conducted an infringement analysis complete with claims charts. 673 F.3d at 1375. The court there acknowledged that "[i]n many cases a controversy made manifest by a patentee's affirmative assertion of its patent rights will dissipate as market players and products change," but held that the passage of time did not weigh against declaratory judgment where the relevant circumstances around a patentee's assertion of patent rights had not changed. *Id.* at 1380-81.

In this case, given the relatively ambiguous nature of the November 2010 letter, there was no initial "controversy made manifest by a patentee's affirmative assertion of its patent rights." Unlike the threats in *Myriad*, *Micron*, and *3M*, Defendants' offer to license the '155 patent never identified the products for which Defendants believed the license to be required. Further, the parties' actions, or lack thereof, after the November 2010 letter indicate that any threat created by the November 2010 letter has not matured into a ripe controversy. Plaintiff admits that it has not refrained from manufacturing or distributing any products because of the letter. Yet, Defendants took no action. Defendants, for their part, have not engaged in the kind of systematic litigation as the defendant in *Micron*. Since sending the November 2010 letter, Defendants have done nothing to demonstrate willingness to litigate the '155 patent other than provide the term sheet which *Plaintiff* requested in April 2012. Indeed, Defendant's inactive and significant delay in taking any action to enforce the '155 patent after the November 2010 letter is telling inasmuch as Defendant risks the defense of laches if Defendant were to now bring an enforcement action. *See A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992). Under these circumstances, the passage of time without any indication from Defendants or other circumstances implying that Defendants intend to enforce the '155 patent against Plaintiff weighs against finding a justiciable controversy.

In sum, Plaintiff has not established Article III standing to seek declaratory relief.

1   While this case presents a closer case than those cited above where no justiciable case or
2   controversy was found, the relevant factors on balance militate against a finding of a justiciable case
3   or controversy. However, even if there is a case or controversy under Article III, this Court retains
4   discretion to decline to entertain claims under the Declaratory Judgment Act. *Wilton*, *supra*, 515
5   U.S. at 282; *3M Co.*, *supra*, 673 F.3d at 1377. The Court finds it appropriate to decline to exercise
6   jurisdiction over Plaintiff's claim for declaratory relief on the '155 patent, as it appears from the
7   facts in this case that Plaintiff took specific actions to attempt to manufacture a controversy over the
8   '155 patent, possibly to gain leverage in the dispute over the '375 patent. *See Teva Pharmaceuticals*
9   *USA, Inc. v. EISAI Co., Ltd.*, 620 F.3d 1341, 1349 (Fed. Cir. 2010) *cert. granted, judgment vacated*
10  *sub nom. Eisai Co. Ltd. v. Teva Pharmaceuticals USA, Inc. ex rel. Gate Pharmaceuticals Div.*, 131
11  S. Ct. 2991, 180 L. Ed. 2d 818 (U.S. 2011) *and vacated sub nom. Teva Pharmaceuticals USA, Inc.*
12  *ex rel. Gate Pharmaceuticals Div. v. EISAI Co., Ltd.*, 426 F. App'x 904 (Fed. Cir. 2011)
13  (recognizing that the Federal Circuit has "upheld discretionary decisions declining jurisdiction when
14  the declaratory judgment action was duplicative of other proceedings, the party instituted an action
15  solely to enhance its bargaining power in negotiations, or when reexamination proceedings were
16  pending").

### IV.   CONCLUSION

18  For the foregoing reasons, Defendant's motion to stay Counts I and II pending the outcome
19  of the related arbitration proceedings is **GRANTED.** Defendant's motion to dismiss Counts III and
20  IV for lack of subject matter jurisdiction is likewise **GRANTED** without prejudice to a future action
21  should circumstances change.

22  This order disposes of Docket Nos. 50 and 61.

24  IT IS SO ORDERED.

26  Dated: January 17, 2013

_____
EDWARD M. CHEN
United States District Judge

19